STATE OF NEBRASKA v. TIM O'ROURK ET AL.

[FILED NOVEMBER 10, 1892.]

1. **Sunday Law**: SPORTING. Under the provisions of section 241 of the Criminal Code any person of fourteen years of age or upwards who shall, on Sunday, engage in sporting, etc., shall be fined in a sum not exceeding twenty dollars, or be confined in the county jail not exceeding twenty days, or both.

2. ———: ———: PLAYING BASE-BALL. Playing base-ball on Sunday comes within the definition of sporting, and renders the persons engaging therein liable to the punishment provided for in section 241.

EXCEPTIONS to the decision of the district court for Lancaster county, HALL, J., presiding. Filed under the provisions of section 515 of the Criminal Code.

The defendants were arrested on a complaint charging them with violating section 241 of the Criminal Code, by playing base-ball on Sunday, as an exhibition at which an admission fee was charged. The case was tried on a stipulation of facts before the county judge. He held that the complaint and stipulation do not charge or establish facts constituting an offense under the laws of the state of Nebraska. The defendants were discharged. Upon a hearing in the district court the decision of the county judge was sustained. The county attorney filed exceptions and removed the cause to this court to settle the law. *Exceptions sustained.*

*Novia Z. Snell, County Attorney, Frank W. Lewis,* and *J. R. Webster,* for the state: .

The Christian religion and the sanctity of Sunday as a holy day are parts of the fundamental law of the United States. (*People v. Ruggles,* 8 Johns. [N. Y.], 290; *Campbell v. International Society,* 4 Bos. [N. Y.], 298; *Common-*

State v. O'Rourk.

*wealth v. Jeandelle*, 3 Phila., 509; *Moore v. Hagan*, 2
Duv. [Ky.], 437; *Davis v. Fish*, 1 Greene [Ia.], 406;
*Gholston v. Gholston*, 31 Ga., 625; *Weldon v. Colquitt*, 62
Id., 449; *State v. Ricketts*, 74 N. Car., 187; *Lindenmuller,*
*v. People*, 33 Barb. [N. Y.], 548; *Commonwealth v. Eyre*,
1 S. & R. [Pa.], 347; *Johnson v. Commonwealth*, 22 Pa.
St., 102; *Stockden v. State*, 18 Ark., 186; *Kilgour v. Miles*,
6 Gill. & J. [Md.], 268; *Commonwealth v. Wolf*, 3 S. &
R. [Pa.], 48; *Lieberman v. State*, 26 Neb., 469; *Common-*
*wealth v. Depuy*, Brightly Rep. [Pa.], 44; *State v. Ambs*,
20 Mo., 214; *Nashville v. Linck*, 12 Lea [Tenn.], 499;
*State v. King*, 23 Neb., 546.) The Sabbath being so re-
garded and recognized by the law, the community have
and ought to have power to enforce its observance. (*Scam-*
*mon v. Chicago*, 40 Ill., 146; *Cotton v. Huey*, 4 Ala., 56;
*Brackett v. Edgerton*, 14 Minn., 174; *Shaw v. McCombs*,
2 Bay [S. Car.], 232; *Kountz v. Price*, 40 Miss., 341;
*O'Donnell v. Sweeney*, 5 Ala., 467; *Commonwealth v. Nes-*
*bitt*, 34 Pa. St., 398; *State v. B. & O.*, 15 W. Va., 362;
*Shover v. State*, 10 Ark., 259; *State v. Mark*, 9 S. E. Rep.
[Va.], 475; *Towle v. Larrabee*, 26 Me., 464; *Rapp v.*
*Reehling*, 23 N. E. Rep. [Ind.], 777; *Allen v. Gardner*, 7
R. I., 22; *People v. Scranton*, 61 Mich., 244; *Lovejoy v.*
*Whipple*, 18 Vt., 379; *Troenert v. Decker*, 51 Wis., 46.)

Except where a word, term, or phrase is especially
defined, all words used in the Criminal Code are to be
taken and construed in the sense in which they are under-
stood in common language. (Criminal Code, sec. 254.)
Under this rule of construction, the word "sporting," as
used in section 241 of the Criminal Code, includes playing
base-ball. (Webster's Dic.; Century Dic.; Encycl. Dic.)

*Charles E. Magoon, contra.*

In the absence of a statute there is no legal obligation
to observe Sunday as distinguished from any other day of
the week. (*Bloom v. Richards*, 2 O. St., 387; *McGatrick*

*v. Wason,* 4 Id., 566; *More v. Clymer,* 12 Mo. App., 11; *Commonwealth v. L. & N. R. C.,* 80 Ky., 291.) Playing base-ball is an athletic exercise, the same as walking, running, riding, and rowing, and is not prohibited by the statute. Walking does not violate statute. (*Hamilton v. Boston,* 14 Allen [Mass.], 475; *Davidson v. Portland,* 69 Me., 116; *O'Connell v. Lewiston,* 65 Me., 34.) Nor does driving or sailing. (*Nagle v. Blown,* 37 O. St., 7.) Nor does shaving customers. (*State v. Lorry,* 7 Baxt. [Tenn.], 95.) Nor does transporting cattle. (*Phila. & B. R. Co. v. Lehman,* 56 Md., 209.) Nor repairing switch on railroad. (*Yonoski v. State,* 79 Ind., 393.) Nor gathering grain. (*Turner v. State,* 67 Ind., 595.) Nor labor to prevent waste of sap in making maple sugar. (*Whitcomb v. Gilham,* 35 Vt., 297.) Nor is playing base-ball on Sunday a violation of the law. (*St. Louis Association v. Delano,* 37 Mo. App., 284.)

The legal definition of sporting is "killing and taking game on a man's own land." (Rapalje's Law Dic.) This being the well known meaning of the term at common law, its use in the statute is restricted to that sense. (Sutherland, Statutory Construction, sec. 253, and cases cited.)

MAXWELL, CH. J.

In April, 1891, the county attorney of Lancaster county filed in the county court a complaint as follows:

"The complaint and information of James G. Guild of said county made before me, Willard E. Stewart, county judge of said county, on this 30th day of April, A. D. 1891, who, being duly sworn on his oath, says: That Tim O'Rourk, Charles S. Abbey, Clarence Baldwin, John O'Brien, Clarence Conley, William Goodenough, Frederick Ely, Charles Hamburg, Jewett Meekin, Charles Collins, John Cline, Henry Raymond, John Rowe, Jesse Burkett, John Irwin, Owen J. Patten, Philip Tomney, Park Wilson, Emmett Rogers, William Darnbrough, each of said

persons being of the age of fourteen years and upwards, on the 26th day of April, A. D. 1891, said day being the first day of the week, commonly called Sunday, at said county of Lancaster, did unlawfully engage in sporting, and were found sporting and engaged in the game commonly called base-ball, at Lincoln Park base-ball grounds, an enclosure where the game or athletic sport commonly known as base-ball is played and performed as an exhibition by professional players to spectators who are admitted to such exhibition for a fee and reward by such spectators paid to view the same, there being then present about thirty-five hundred spectators at the time aforesaid and place aforesaid, viewing said athletic sport, contrary to the form of the statute in such case made and provided and against the peace and dignity of the state of Nebraska.

"Affiant further says the said Tim O'Rourk, Charles S. Abbey, Clarence Baldwin, John O'Brien, Clarence Conley, William Goodenough, Frederick Ely, Charles Hamburgh, Jewett Meekin, Charles Collins, John Cline, Henry Raymond, John Rowe, Jesse Burkett, John Irwin, Owen J. Patten, Philip Tomney, Park Wilson, Emmett Rogers, William Darnbrough, each of said persons being of the age of fourteen years and upwards, on the 26th day of April, A. D. 1891, said day being the first day of the week, commonly called Sunday, at the county of Lancaster, at Lincoln Park base-ball grounds, an enclosure where the game or athletic sport commonly known as base-ball is played and performed by professional players employed and hired for and during a fixed period of six months then current at a fixed and agreed reward and monthly salary to pursue the vocation of playing said game of base-ball for the entertainment of spectators for hire, did unlawfully engage in common labor, to-wit, performing the game or athletic sport commonly known as base-ball for hire, the same being their regular employment and vocation, in which said employment and vocation they were then and

there found, such common labor not being a work of ne-
cessity or charity, contrary to the form of the statute in
such case made and provided and against the peace and
dignity of the state of Nebraska."

The parties were thereupon arrested and taken before the
county judge for trial.

The attorneys for the parties entered into an agreement
as to the facts as follows:

"It is hereby stipulated and agreed that this case shall
be submitted to the above named county judge for trial and
determination upon the following agreed state of facts, viz.:

"First—On Sunday, the 26th day of April, 1891, be-
tween the hours of 3 o'clock and 5 o'clock P. M., in the
county of Lancaster and state of Nebraska, the defendants
played a game of base-ball.

"Second—On said 26th day of April, 1891, each of
said defendants was over the age of fourteen years.

"Third—The playing of said game of base-ball was not
a work of charity or necessity.

"Fourth—Three thousand spectators were present at
the time said game of base-ball was played and paid an
admittance fee for the privilege of viewing said game while
it was being played, but no part of said admittance fee was
paid to or received by the defendants or any of them.

"Fifth—On the day said game of base-ball was played
the defendants were each under employment by the month
to play base-ball for compensation, but playing base-ball
was not the usual or ordinary vocation of the defendants
or any of them.

"Sixth—Said game of base-ball was played upon the
grounds of private parties, and was not played within one-
half mile of any dwelling house, school house, church
building, or the limits of any incorporated city or village.
Said game was not played within one hundred yards of
any public highway, and the grounds upon which said
game was played were enclosed by a tight board fence ten

feet high, which fence completely obstructed the view from the outside of said enclosure. Said game was not played for any stake, wager, or thing of value.

"Seventh—Upon the foregoing agreed state of facts, and without further testimony or evidence, this case shall be submitted to said county judge for trial and determination."

The case was then submitted to the county judge upon the complaint and stipulation of facts. He held that the "complaint and stipulation of facts do not charge or establish facts constituting an offense under the laws of the state of Nebraska," and therefore discharged the persons accused. The case was taken on error to the district court to settle the law relating to the matter. The district court affirmed the judgment of the county court, whereupon the county attorney asked and obtained leave of this court to file a petition in error to settle the law of the case.

Section 241 of the Criminal Code provides: "If any person of the age of fourteen years or upward shall be found on the first day of the week, commonly called Sunday, sporting, rioting, quarreling, hunting, fishing, or shooting, he or she shall be fined in a sum not exceeding twenty dollars, or be confined in the county jail for a term not exceeding twenty days, or both, at the discretion of the court. And if any person of the age of fourteen years or upward shall be found on the first day of the week, commonly called Sunday, at common labor (work of necessity and charity only excepted), he or she shall be fined in any sum not exceeding five dollars nor less than one dollar; *Provided*, Nothing herein contained in relation to common labor on said first day of the week, commonly called Sunday, shall be construed to extend to those who conscientiously do observe the seventh day of the week as the Sabbath, nor to prevent families emigrating from traveling, watermen from landing their passengers, superintendents or keepers of toll bridges or toll gates from attending

and superintending the same, or ferrymen from conveying travelers over the water, or persons moving their families on such days, or to prevent railway companies from running necessary trains."

Webster defines "sporting," "1. To play; to frolic; to wanton. 2. To represent by any kind of play," and as synonyms gives "to play; frolic; game; wanton." (Ed. of 1881, p. 1276.) The definitions in the Century are the same, but somewhat more extended. In the same authority (Webster), p. 111, "base-ball" is defined as "a game of ball, so called from the bases or bounds (usually four in number) which designate the circuit which each player must make after striking the ball." That playing base-ball comes within the term "sporting," and is, therefore, a violation of the statute, there can be no doubt.

But it is claimed, in effect, that restraint of the kind named is in contravention of natural right or religion, and therefore is in excess of the powers of the legislature. The right of free, equal, and undisturbed enjoyment of religious opinion, whatever it may be, and to fully discuss the same, is secured to every one. Free discussion, however, is the outgrowth of free government. All free government is based on the divine law. God gave the ten commandments to Moses, which contain rules designed to apply to the whole race. Although given to the Israelites, they were designed for all humanity. The Israelites were constantly lapsing into idolatry. There are noble examples of manhood, however, in their history, but the ignorance of the public, the almost continuous wars, internecine, offensive, or defensive, together with the pagan influences of the surrounding nations, prevented the development of the nation, and it became a prey to the Babylonians, and later to the Roman empire. If we look at the world at the time of the birth of Christ, there was not, so far as we know, a nation where equal and just rights were enjoyed by all, nor where the rights of the poor were adequately

protected and enforced, if indeed, considered. The Roman empire, then at the height of its power, had much to commend it. Many of its rulers were men of genius, ability, and manhood, but punishments of all kinds were of the most cruel character; war was carried on for conquest and with a degree of barbarity that shocks our feelings of humanity. Captives were sold into slavery and practically possessed no rights that their masters were bound to respect. A pastime of the Roman populace was to witness deadly contests of captives with wild beasts or each other. Even as late as the third century after Christ's birth this barbarous practice was in force. Gibbon, in the Decline and Fall of the Roman Empire, vol. I, p. 386 (Millman ed.), says: "We cannot, on this occasion, forget the desperate courage of about fourscore gladiators, reserved, with near six hundred others, for the inhuman sports of the amphitheatre. Disdaining to shed their blood for the amusement of the populace, they killed their keepers, broke from the place of their confinement, and filled the streets of Rome with blood and confusion. After an obstinate resistance, they were overpowered and cut in pieces by the regular forces; but they obtained at least an honorable death, and the satisfaction of a just revenge." Cruelty was the rule and death inflicted as punishment for trivial causes. Specimens of Roman justice may be seen in the trial of Christ before Pilate, and Paul before Felix and Festus. In neither case was there the semblance of an accusation based upon law; yet Christ was condemned to please a mob and Paul would have been delivered to men who had sworn to kill him but for his appeal to Cæsar, and even then he was held a prisoner for two years without a charge against him. The indigent, unfortunate, and discouraged were permitted by the law to sell themselves as slaves, and the rights of the poor were to a great extent at the mercy of the rich and powerful. While there were amphitheatres for the exhibition of brutal contests between men and wild beasts, or between captives to furnish

amusement to an unfeeling populace, there were no pub-
lic hospitals for the insane, sick, or unfortunate. In addi-
tion to this, covetousness, licentiousness, and other vices
prevailed to an extent unknown at the present time, nor, so
far as we are informed, was any nation superior in any of
these respects to the Romans. The most favorable view
that can be taken of any government of that date is to say
that might alone controlled, and right was a remote consid-
eration.

The birth of Christ was ushered in by the proclamation
by angels of peace, "Glory to God in the highest, and on
earth peace, good will toward men." (Luke, 2:14.) His
birth was among the poor and lowly, as if to show that
wealth is a mere circumstance which adds nothing to either
the usefulness or respectability of its possessor. He taught
purity of life, unselfishness, good will toward friends and
foes alike, doing good to all as opportunity offered; that
religion affected and controlled the life of the individual,
and did not consist in mere outward observances. He
condemned covetousness, licentiousness, selfishness, and
self-righteousness, and insisted on the equality of the race.
He practiced his own preaching, and led a life of poverty,
purity, and doing good. None so poor as not to claim his
sympathy and assistance, nor so wealthy and great as to be
above his consideration. The lepers, the blind Bartimeus,
the rich centurion, alike were recipients of his beneficence.
All were welcome, the only conditions being that they
needed his aid and applied for it. His unselfishness, His
magnanimity, the nobility of His character were misunder-
stood by those who were looking for a deliverer from the
Roman yoke, and by others who had been taught to re-
gard the law of Moses as perfection. The Jews, who, as
the children of Abraham, deemed themselves the favored
people of God, were neither expecting nor desiring a leader
for mankind, but rather one who, like Moses, would lead
them out of hated Roman bondage; neither could they

understand a system that, while accepting much of the law of Moses, proposed to supersede its rites and ceremonies. Many centuries before, the prophets in glowing language had foretold the birth of a son, the Prince of Peace, who would establish His throne with judgment and justice forever. These statements seem to have been taken literally, as applying alone to an earthly prince who should destroy the enemies of the Jews. It is apparent, however, that the prophets' utterances refer to a spiritual ruler who would conquer by love, and whose followers would be guided by his precepts and establish justice and right.

From the crucifixion of Christ until the present time the contest between Christianity and wrong has been going on. Wherever Christianity has prevailed free and untrammeled, liberty has existed. It forbids cruelty, haughtiness, arrogance, pride, licentiousness, and covetousness. It requires a return of good for evil, and aid for the suffering in distress, whether friend or foe, and has established the rule that we shall do unto others as we would have them do unto us. It requires honesty, honor, and integrity in all the affairs of life, and fair treatment for every one. In every Christian land it has swept away the harem and seraglio, made bigamy and polygamy crimes, and elevated woman from a condition of semi-serfdom to be the equal of man. It has broken the captive's chains and mitigated the horrors of war, and there are indications that between Christian nations at least soon "They shall beat their swords into ploughshares and their spears into pruning hooks." It has abolished slavery in every Christian land and enfranchised the slave and given him an opportunity to develop his manhood. It has ennobled labor and established the rule that "the laborer is worthy of his hire." We admire the declaration of independence as a statement of principles based upon the equality of the race and give credit to the authors as statesmen and benefactors, not only of this nation, but mankind. The sturdy independence of

the barons who at Runnymede compelled King John to sign *Magna Charta*, has been the subject of eulogy in both song and story, but the principles of both are found in the sermon on the mount. It may safely be said that the charter of liberty reaches back to Christ's teaching. Christianity is woven into the web and woof of free government and but for it free government would not have existed, because no other system has been able to check the selfishness, greed, arrogance, cruelty, and covetousness of the race.

In *People v. Ruggles*, 8 Johns. [N. Y.], 294, in a prosecution for blasphemy, Ch. J. Kent said: "There is nothing in our manners or institutions which has prevented the application or the necessity of this part of the common law. We stand equally in need, now as formerly, of all that moral discipline, and of those principles of virtue which help to bind society together. The people of this state, in common with the people of this country, profess the general doctrines of Christianity as the rule of their faith and practice; and to scandalize the author of these doctrines is not only, in a religious point of view, extremely impious, but, even in respect to the obligations due to society, is a gross violation of decency and good order. Nothing could be more offensive to the virtuous part of the community, or more injurious to the tender morals of the young, than to declare such profanity lawful. It would go to confound all distinction between things sacred and profane, for, to use the words of one of the greatest oracles of human wisdom, 'profane scoffing doth by little and little deface the reverence for religion,' and who adds in another place, 'two principal causes have I ever known of atheism—curious controversies and profane scoffing.' (Lord Bacon's Works, vol. 2, 291–503.) Things which corrupt moral sentiment, as obscene actions, prints, and writings, and even gross instances of seduction, have, upon the same principle, been held indictable, and shall we form an exception in these particulars to the rest of the civilized world?"

State v. O'Rourk.

It may be true that the professed followers of Christ are not, in all cases, as unselfish as they should be, or as is their right and privilege, but progress is being made in that direction and many examples of self-denial and unselfishness may be found.    Let a cry of distress and a call for help come from any part of the world by reason of some great calamity, and the Christian nations at once respond by liberal contributions and other means to relieve the distress.    Schools and colleges are liberally provided and patronized, and education is general.    Hospitals and asylums exist on every hand for the poor, the insane, the blind, deaf, and unfortunate, while punishments for offenses are graduated in proportion to the offense, and a conviction can only take place after a fair public trial upon specific charges, and death is imposed in no case except murder or treason. No fair-minded student of history will deny that these benefits and liberty itself flow from Christianity.    It appeals alone to reason and asks for adoption because of its excellence.    It makes no person the keeper of another's conscience, but requires every one to judge and act for himself.    It tolerates the utmost freedom of opinion and worship, and seeks to coerce no one except by the force of reason.

But while allowing the force of reason to be the sole guide in the adoption or rejection of Christianity, its followers have been impelled from duty to combat wrong and oppression on every hand.    These were strongly intrenched in the selfishness, covetousness, and other vices of the race, so that they have yielded slowly, but they have been gradually dispelled like clouds after a storm, so that the sun shines almost clearly, and without obstruction.    This result has been brought about by almost constant effort, and has cost the lives of hundreds of thousands of martyrs and patriots, and it can only be preserved by constant vigilance.

As a Christian people, therefore, jealous of their liberty and desiring to preserve the same, the state has enacted

43

certain statutes, which, among other things, in effect, recognize the fourth commandment, and the Christian religion and the binding force of the teachings of the Saviour. Among these is the statute which prohibits sporting, hunting, etc., on Sunday.

The human body, considered as a machine, is the most perfect mechanism of which we have any knowledge. If properly cared for and treated, it will, in ordinary cases where there are no hereditary defects, retain its vitality and vigor to old age, but every movement of the body or action of the brain involves waste of the vital force, and this the Creator has provided shall, to a great extent, be replenished during sleep. Hence, it is necessary to spend about one-third of our time in sleep. While it is true that the reserve force of life is so great in many persons as to enable them to live for a time with less than the normal amount of sleep required, yet, if continued for any considerable time, the general health will be affected, and to entirely abstain from sleep for a week or more, as in cases of certain fevers, like the typhoid, almost unavoidably results in temporary insanity, if not death. But the recuperation from sleep in most cases does not restore full tone to the system, and Sunday is like an oasis in the journey of life where each traveler may be refreshed and become more able to continue the performance of his duties or labors. As a natural consequence, if the vitality of the body is permitted steadily to decrease without being replenished, life will be proportionately shortened. Therefore, if a person labors continuously at hard and exacting labor without rest for many years, his health is liable to be impaired and he become prematurely old. No doubt one of the objects of the Creator in establishing the Sabbath as a day of rest was to provide for restoring and retaining, as far as possible, health and strength and perfect action of the body. Every person of observation knows that the man who labors seven days in the week continuously for any considerable length

of time lacks the spring and elasticity of action of another of like years and naturally active habits who rests on Sunday. Experience has also shown that men will accomplish more labor in a series of years by working six days in the week than by continuous application.

Sunday is to be a day of rest. Worldly cares are to be laid aside, and the worries of business or pleasure thrown off. How gladly the tired laborer, workman, farmer, merchant, manufacturer, attorney, and judge welcome Sunday as a day of rest and on the succeeding Monday enter upon their respective labors with renewed strength and vigor The idler and trifler may complain of the loss of time from resting on Sunday; but the active, intelligent, worker knows that thereby he has increased his capital stock of health and chances of longevity. Christ sought to apply the Sabbath to its appropriate use. The Jewish religion at that time consisted largely of outward ceremonies which were performed with a rigor never intended by the author of the Mosaic law. It is evident that great reliance was placed upon these outward ceremonies. Christ, however, while not condemning many of these ceremonies, intended to show that the mere observance of these was not sufficient; that the Sabbath was made for man, and not man for the Sabbath; and in effect, therefore, that works of charity, mercy, and necessity not only could, but if necessary should, be performed on that day. He recognized the Sabbath, however, as a day of rest set apart by the Creator. After His death and resurrection, His disciples, to commemorate that event, changed the day to the first day of the week, and that day is now observed by the great body of His followers throughout the world, and is recognized by both the common and statute law.

In this state the right of every one to worship God according to the dictates of his own judgment and conscience is recognized, and hence permits those who prefer to keep the seventh in place of the first day of the week to do so.

The law, both human and divine, being thus in favor of abstaining from sporting, etc., on Sunday, is a reasonable requirement and should be enforced.    The deliberate violation of such a law, there is reason to believe in many cases, is but the commencement of a series of offenses that lead to infamy and ruin; and in any event the influence upon the participants themselves has a tendency to break ·down the moral sense and make them less worthy citizens.    The state has an interest in their welfare and may prevent their violation of the law.    The state, in order to prevent vice and immorality, may punish licentiousness, gambling of all kinds, the keeping of lotteries, enticing minors to gamble, or to permit one under eighteen years of age to remain in a billiard room ; to punish publishing, keeping, selling, or giving away any obscene, indecent, or lascivious paper, book, or picture, and also punish any person who shall lend or show to any minor child any such paper, publication, or picture, etc.    The law also punishes the disturber of a religious meeting, school meeting, election, etc.    These cases show the importance felt by the legislature, of evils of the kind named, and others, by means of which, in addition to wrongs inflicted on the persons injured, a spirit of insubordination is created and fostered which incites to evil and tends to subvert the just and equal rights of some, or all. In addition to this, every person has a right to the quiet and peace of a day of rest.    He has also a right to the enforcement of the law so that the evil example of a defiance of the law shall not be set before his children.    The state has an interest in their welfare also, in order that they may become useful citizens and worthy and honorable members of society.    The fact that the defendants were some distance away from the residence of any person can make no difference.    It did not change the nature of the offense nor excuse the act.    It was a violation of the law just the same..

The question here presented was before the Kansas City

court of appeals in *State v. Williams*, 35 Mo. App., 541, and it was held the parties were liable.   Afterwards the question of the validity of a contract arose.   In *St. Louis, etc., Ass'n v. Delano*, 37 Id., 284, in an action upon a contract, it was held that under the Missouri statute athletic games and sports on Sunday were not prohibited.   The case was then taken to the supreme court of that state, where the judgment was affirmed.   (*St. Louis, etc. Ass'n v. Delano*, 18 S. W. Rep. [Mo.], 1101.)   An examination of the statute shows that it is not as broad as ours.   In addition to this it is evident the question of the validity of the contract was not raised by the pleadings and therefore was not in issue.   Under our statute, however, sporting is clearly prohibited and the party guilty thereof is liable to the punishment provided by statute.

It is unnecessary to consider the other branch of the case.

The district court and also the county court erred in holding that the defendants were not liable, and dismissing the action.

EXCEPTIONS SUSTAINED.

THE other judges concur.