## SCOUGALE *v.* SWEET.

BREACH OF THE PEACE—SUNDAY BASEBALL—DUTY OF SHERIFF—LIBEL—EVIDENCE—DAMAGES.

   *1. Games of baseball upon Sunday are prohibited by section 5912, Comp. Laws 1897, and are breaches of the peace under section 11334.

   2. It is the duty of the sheriff, as the chief police officer of the county, to suppress them, as unlawful assemblies, and to arrest the offenders.

   3. To charge a sheriff with an intentional neglect of duty is libelous *per se.*

   4. An instruction that it was not the duty of the sheriff to prevent such a game is erroneous.

   5. A statement made by the defendant, during the trial, to plaintiff's attorney, that he would make the plaintiff smart if this persecution (meaning the suit) continues, is not evidence of malice in publishing the article.

   6. Where there is no proof of actual damages to the plaintiff in his office, only nominal damages can be recovered.

---

   * Head-notes by GRANT, J.

Error to Shiawassee; Daboll, J., presiding. Submitted April 5, 1900. Decided May 29, 1900.

Case by Monroe L. Scougale against John Sweet for libel. From a judgment for plaintiff, defendant brings error. Reversed.

Plaintiff was sheriff of Shiawassee county, and resided in the city of Corunna. Defendant was a clergyman of the Methodist Episcopal Church, and resided in the city of Owosso. These two cities are about 2¾ miles apart, and connected by a street railway. About midway between the two is Caledonia Park. The main street in Corunna is about 1¾ miles from the park, and the principal street in Owosso is about 1 mile from it. In three local newspapers ( two dailies and one a weekly), on Saturday, appeared the following notices:

"It is expected that the Owosso Grays and the Bay City team will play ball on the new grounds near Caledonia Park on Sunday."

"There will be a game of baseball tomorrow at the new ball grounds, near Caledonia Park."

"The baseball ground near the park is ready for the game Sunday. A grand-stand has been erected, and the diamond put in first-class shape. A large crowd is expected to witness Owosso administer a defeat to Bay City."

Two of these papers were taken by plaintiff.

The defendant on Saturday night, about 7 o'clock, called up the plaintiff by telephone, and conversed with him in regard to the game. The parties differ somewhat as to the conversation had between them. Defendant's version is as follows:

"On Saturday evening I called up the sheriff by 'phone, and asked him if the ball game, 'as advertised to be played tomorrow,' was going to be allowed to come off. He asked me, 'What baseball game?' I said, 'A baseball game is advertised to be played between this city and Corunna tomorrow;' and he asked me who was the manager of it. I told him I did not know, but would find out. I said, 'The people of Owosso—a large number of the

citizens of Owosso—are indignant over such an outrage,'
and I thought that we ought to have the protection that
the law afforded us. And he said he would see the prose-
cuting attorney, and find out what he ought to do. I
said, 'The law makes it very clear what you ought to
do; you ought to prevent the commission of a crime,
when it is advertised beforehand.' About five minutes
later I called him up, and informed him who the manager
of the Owosso team was."

Plaintiff's version of the conversation is as follows:

"I remember the circumstances of Mr. Sweet calling
me up by 'phone to notify me that he understood there
was to be a ball game on the following day, which was
Sunday. He asked me if I was aware it was pub-
licly announced that there was going to be a ball game
Sunday. I told him I was not. He said, 'Such is the
case,' and he thought it ought not to occur. I said I
thought so, too. I said I did not uphold any such work,
and asked him who the manager of the game was. He
informed me he did not know, but would try and find out.
In a short time he called me up again, and informed me
Mr. Parshall was manager of the game. I informed him
I would call Mr. Parshall up at once. That was all the
conversation between us."

The ball ground had been arranged, seats prepared, and
canvas stretched around the park. One Van Houten
called up the sheriff on Saturday night, and told him he
understood they were going to play ball there Sunday,
and that he saw the canvas was up all around the park.
Two or three days before the Sunday in question, Mr.
Parshall, the manager of the Owosso ball club, saw plain-
tiff and the prosecuting attorney, and asked them about
playing games on Sunday. Chandler said to Mr. Par-
shall, "You better be careful." Mr. Parshall, who was
called as a witness for the plaintiff, testified: "I told the
sheriff and Mr. Chandler that we intended to play a game
of ball the next Sunday, and Mr. Chandler said, 'You had
better be careful.'" Plaintiff testified that Parshall did
not tell him that the game was to be played. After re-
ceiving the notification from defendant and from Van

Houten, plaintiff testified that he went some time that evening to Mr. Chandler's office, and did not find him. He did not go to his house, or make any further effort to see him and ask his opinion and advice in the matter. Plaintiff testified that he had not seen these notices in the papers, and that, after Mr. Sweet had notified him, he called up Mr. Parshall and told him that he had been notified that he (Parshall) was manager of the ball game, and was going to play a game on Sunday; that Parshall said, "There was no such thing advertised, and he didn't know as they were going to play;" that he told him if he did play he did it at his own risk,—that he (plaintiff) would have to do his duty in the matter; that Parshall said, "If there is a game to be played, I will let you know;" and that he (plaintiff) relied on the information furnished him by Parshall. On cross-examination plaintiff testified:

"I did not know from what Mr. Sweet and Mr. Van Houten told me that there was a ball game advertised; I simply had their words for it. I did not prefer to take Mr. Parshall's word, in preference to Mr. Van Houten's and Mr. Sweet's, that there was not going to be a ball game; but I took Mr. Parshall's statement, and acted on it. I relied upon it. I relied more on his than upon Mr. Sweet's, because they said it was hearsay; they said they heard it was going to be played. Mr. Parshall did not tell me, when I called him up, that he expected to play a game there; but, when I asked him if a game was going to be played, he said there wasn't any such thing advertised, and he didn't know as they were going to play ball. That is the answer he gave me, and all that I know about it. He asked me what the consequences would be, from which I inferred that he wanted to know whether I was going to do my duty or not."

Plaintiff further testified that he lived a mile and three-quarters from the park; did not remember where he was on Sunday afternoon; was not in Owosso; that he did not see the canvas fence before the game was played; did not notify any of his deputies; that he had two in Corunna, and an undersheriff and a deputy in Owosso; that all the measures he took to prevent the

game was "calling up the manager, and notifying him not to play."

Parshall's version of the conversation between him and plaintiff is substantially as follows:

"Plaintiff asked me if there was going to be a game of ball played on Sunday. He said he understood there was. I asked him who was his authority. He wouldn't tell me. He said he understood there was going to be a game of ball played, and asked me if it was so, and I told him we had intended to play.

"Q. Detail the conversation as briefly as possible.

"A. I had to ask him some questions before I could answer him. I don't know how to answer your questions.

"Q. When he said he had been informed there was going to be a ball game played, he asked you, did he not, if you intended to play a game of ball on Sunday?

"A. He did.  *  *  *  After we talked a little, I told him there wouldn't be any game."

Parshall further testified, on cross-examination: "I understood that the sheriff, as conservator of the peace, would be the man to prevent the violation of the law." It was in view of this knowledge that Parshall asked the sheriff and Chandler what they thought about playing on Sunday. On redirect examination he gave the following testimony:

"I said the sheriff, when I talked with him by 'phone, gave me some information what would happen if the game was played. When I asked him what would be the trouble if we played, he said he would have to serve any warrants if any were issued. I asked him, if there were no warrants issued, if the game would be allowed to go on. He replied that would depend on what advice he had from Mr. Chandler. I think I told him, the last thing I said, that we would not play without letting him know. He said he would have to do his duty; that, if warrants were put into his hands, he would have to serve them, but, if no warrants were issued, it would depend on what the prosecuting attorney told him. He did not tell me he would interfere or not, but said, if he was in my place, he wouldn't play. He did not say he would do anything unless a warrant was placed in his hands to serve."

The game was played, and an admission fee charged; was attended by about 300 people; lasted 1 hour and 38 minutes; and was accompanied by the usual shouts and noise, which could be heard a long distance away. Parshall attended the game, and took charge of the proceeds. He did not notify the sheriff that the game would be played. The following week defendant published an open letter to the plaintiff in two local newspapers, reading as follows:

"When you assumed your present office, you took oath to enforce the laws of the State. To violate an oath is always shameful,— particularly so when it relates to official duties. Yet this thing you have done. In legal terms, the violation of an oath is called 'perjury.' You have allowed two gangs of criminals to commit crime after due notification had been given you of such intention, first by the criminals themselves, and subsequently by more than one law-abiding citizen. Your absence from the scene of this crime (the baseball game on Sunday last) is itself criminal, and you ought to have self-respect enough left to resign your office. When openly-avowed criminals have no fear of the sheriff before their own eyes, the sheriff is no good. It has not been left to you to determine who shall obey the law; the State has determined that all shall do so. In choosing to exempt certain lawless persons from the obligation which the law imposes on all citizens, you have arrogantly usurped the functions of the State.               Yours truly,
                                    "JOHN SWEET."

Plaintiff thereupon brought this action for libel, and recovered verdict and judgment for $1,000,—$50 damage to his office, and $950 for damage to his feelings. Plaintiff made his case by introducing an admission that he was sheriff of the county, and proof of the publication of the articles. There was no testimony as to damages.

*Kilpatrick & Pierpont* ( *Cahill & Wood*, of counsel ), for appellant.

*John T. McCurdy* and *Edwin H. Lyon*, for appellee.

GRANT, J. (*after stating the facts*).   1. What is the legal character of the game of baseball played upon the Sunday in question? It is conceded to have been prohibited by section 5912, Comp. Laws 1897, which imposes a penalty of not to exceed $10 for such offense. It is an offense against the public peace, under section 11334, which provides:

"If any persons to the number of thirty or more, whether armed or not, shall be unlawfully, riotously, or tumultuously assembled in any city, township, or village, it shall be the duty of   *   *   *   the sheriff of the county and his deputies to go among the persons so assembled,   *   *   *   and, in the name of 'the people of this State, to command all the persons so assembled immediately and peaceably to disperse."

That this was an unlawful assembly is conceded. Was it a breach of the peace? The right of the State to enact laws for the observance of the Sabbath is beyond the domain of discussion. Nearly every law that has been passed upon the subject has been contested in the courts. Upon no subject is there a greater unanimity in judicial opinions. I find but one decision which has held such a law unconstitutional. *Ex parte Newman,* 9 Cal. 502. The opinion in that case was by a bare majority of the court, Justice Field dissenting. That decision was overruled by a unanimous opinion of the court in *Ex parte Andrews*, 18 Cal. 678. These laws do not infringe upon the religious freedom guaranteed by the constitutions of the United States and of the various States. The statute carefully exempts those who conscientiously believe in the observance of the seventh day of the week, and who actually refrain from secular business and labor on that day. Whether they are enacted because of the necessity of a day of rest, or out of regard to the religious practices and beliefs of the people, or from both considerations, we need not consider. In view, however, of the notorious disregard of some of the provisions of these laws, and the notorious neglect of some sheriffs and other police officers

to enforce them, a reference to some of the decisions may be pertinent.

The State of Georgia enacted a law prohibiting the running of freight trains in that State on Sunday. It was attacked as conflicting with interstate commerce. The law was held valid; the court, speaking through Mr. Justice Harlan, saying:

"The statute of Georgia is not directed against interstate commerce. It establishes a, rule of civil conduct applicable alike to all freight trains,—domestic as well as interstate. It applies to the transportation of interstate freight the same rule precisely that it applies to the transportation of domestic freight. And it places the business of transporting freight in the same category as all other secular business. It simply declares that, on and during the day fixed by law as a day of rest for all the people within the limits of the State from toil and labor incident to their callings, the transportation of freight shall be suspended." *Hennington* v. *Georgia,* 163 U. S. 299 (16 Sup. Ct. 1086).

Chief Justice Kent, in 1811, in an indictment for blasphemy, said:

"And why should not the language contained in the indictment be still an offense with us? There is nothing in our manners or institutions which has prevented the application or the necessity of this part of the common law. We stand equally in need now as formerly of all that moral discipline and of those principles of virtue which help to bind society together. The people of this State, in common with the people of this country, profess the general doctrines of Christianity as the rule of their faith and practice; and to scandalize the author of these doctrines is not only, in a religious point of view, extremely impious, but, even in respect to the obligations due to society, is a gross violation of decency and good order. Nothing could be more offensive to the virtuous part of the community, or more injurious to the tender morals of the young, than to declare such profanity lawful." *People* v. *Ruggles,* 8 Johns. 290 (5 Am. Dec. 335).

If the utterance of blasphemy is offensive to the virtuous part of the community, and injurious to the morals of the young, is not an open, boisterous, and flagrant violation

of these laws equally offensive and dangerous? When citizens become a part of that civil compact known as the "State," and surrender certain of their natural rights, in consideration for which the State promises to protect their persons, property, health, and morals, are they not entitled to have these laws enforced? Is it not demoralizing in the extreme when they are permitted to be openly defied with impunity? A leading case upon the subject is *Lindenmuller* v. *People*, 33 Barb. 548, which involved a statute prohibiting theatrical exhibitions on Sunday. In that opinion appears the following:

"It is exclusively for the legislature to determine what acts should be prohibited as dangerous to the community. The laws of every civilized State embrace a long list of offenses which are such merely as *mala prohibita*, as distinguished from those which are *mala in se*. If the argument in behalf of the plaintiff in error is sound, I see no way of saving the class of *mala prohibita*. Give every one his natural rights, or what are claimed as natural rights, and the list of civil offenses will be confined to those acts which are *mala in se*, and a man may go naked through the streets, establish houses of prostitution *ad libitum*, and keep a faro bank on every corner. This would be repugnant to every idea of a civilized government. It is the right of the citizen to be protected from offenses against decency, and against acts which tend to corrupt the morals and debase the moral sense of the community. Regarding the Sabbath as a civil institution, well established, it is the right of the citizen that it should be kept and observed in a way not inconsistent with its purpose and the necessity out of which it grew,—as a day of rest, rather than as a day of riot and disorder, which would be effectually to overthrow it, and render it a curse rather than a blessing."

Under a statute which prohibited sporting, etc., on Sunday, baseball games were held to come within the definition of "sporting." *State* v. *O'Rourk*, 35 Neb. 614 (53 N. W. 591, 17 L. R. A. 830). The learned chief justice in that case used the following language:

"The law, both human and Divine, being thus in favor of abstaining from sporting, etc., on Sunday, is a reason-

able requirement, and should be enforced. The deliberate violation of such a law, there is reason to believe, in many cases, is but the commencement of a series of offenses that lead to infamy and ruin; and, in any event, the influence upon the participants themselves has a tendency to break down the moral sense and make them less worthy citizens. The State has an interest in their welfare, and may prevent their violation of the law. The State, in order to prevent vice and immorality, may punish licentiousness, gambling of all kinds, the keeping of lotteries, enticing minors to gamble, or to permit one under 18 years of age to remain in a billiard-room; to punish publishing, keeping, selling, or giving away any obscene, indecent, or lascivious paper, book, or picture; and also punish any person who shall lend or show to any minor child any such paper, publication, or picture, etc. The law also punishes the disturber of a religious meeting, school meeting, election, etc. These cases show the importance felt by the legislature of evils of the kind named, and others, by means of which, in addition to wrongs inflicted on the persons injured, a spirit of insubordination is created and fostered, which incites to evil, and tends to subvert the just and equal rights of some or all. In addition to this, every person has a right to the quiet and peace of a day of rest. He has also a right to the enforcement of the law, so that the evil example of a defiance of the law shall not be set before his children. The State has an interest in their welfare, also, in order that they may become useful citizens, and worthy and honorable members of society. The fact that the defendants were some distance away from the residence of any person can make no difference. It did not change the nature of the offense, nor excuse the act. It was a violation of the law, just the same."

See, also, *State* v. *Hogreiver*, 152 Ind. 652 (53 N. E. 921, 45 L. R. A. 504); *State* v. *Powell*, 58 Ohio St. 324 (50 N. E. 900, 41 L. R. A. 854); *People* v. *Havnor*, 149 N. Y. 195 (43 N. E. 541, 31 L. R. A. 689, 52 Am. St. Rep. 707); *People* v. *Bellet*, 99 Mich. 151, 155 (57 N. W. 1094, 22 L. R. A. 696, 41 Am. St. Rep. 589).

In 1820 the territorial legislature of Michigan passed an act entitled "An act to enforce the observation of the Sabbath." Its preamble is as follows:

"Considering that in every community some portion of

the time ought to be set apart for relaxation from worldly labors & employments, & devoted to the social worship of Almighty God and the attainment of religious and moral instruction, which are in the highest degree promotive of the peace, happiness, and prosperity of a people; and whereas, the first day of the week, commonly denominated the Sabbath, has at all times, among Christians in general, been devoted to these important purposes: To the end, therefore, that the good people of this Territory may be enabled, as well on that day as on all proper occasions, freely and without disturbance to perform those great and necessary duties with that decency and solemnity which is suitable to their importance, therefore," etc. 1 Terr. Laws, p. 643.

The law then enacted is substantially the same as that now upon the statute book.

A breach of the peace is "a violation of public order; the offense of disturbing the public peace. * * * An act of public indecorum is also a breach of the peace." Bouv. Law Dict. The term is generic, "and includes unlawful assemblies." 4 Am. & Eng. Enc. Law (2d Ed.), 903. Where the statute prohibited the arrest of any person on Sunday, except in cases of treason, felony, and breaches of the peace, a ball game upon Sunday was held to be a breach of the peace. *In re Carroll*, 12 Wkly. Law Bul. 9. Under our statute, and under the authorities referred to, this game of baseball was a breach of the peace.

2. What was the duty of the sheriff? Upon this point we need say but little. The law is not disputed. It was his duty to prevent the game, and, if the players persisted in proceeding with it, it was his duty to promptly arrest them all. Mr. Parshall knew this, and so, in substance, testified. Plaintiff was presumed to know his duty and to perform it. He did not require the advice of the prosecuting attorney that it was his duty to prevent a breach of the peace, and to be present at any place when he received information that one was to be committed. In *South* v. *Maryland*, 18 How. 396, it was sought to hold

124 MICH.—21.

the sheriff's bond liable for damage resulting to an individual from his neglect to preserve the public peace.    Such an action was held not maintainable.    In regard to the duty of a sheriff as a conservator of the peace, the supreme court in that case said:

" The powers and duties of conservator of the peace exercised by the sheriff are not strictly judicial, but he may be said to act as the chief magistrate of his county, wielding the executive power for the preservation of the public peace.    It is a public duty, for neglect of which he is amenable to the public, and punishable by indictment only."

By statute in New York a sheriff is now made liable for damages to property destroyed by a mob or riot, where notice has been given him of the intended mob or riot, and he fails to take steps to prevent it.    That statute fixes the liability, which did not exist at the common law, but his duty as conservator of the peace was the same.    *Schiellein* v. *Board of Sup'rs of Kings Co.*, 43 Barb. 490.

The inquiry is pertinent whether a sheriff, upon notification that a breach of the peace has been planned and is ready for execution, can perform his duty by inquiry of one of the leaders in the proposed breach of the peace, and receiving an assurance from him that he and his fellows would not accomplish the offense without notifying him of their intention.    If this can be interposed as a defense, in what classes of crimes or misdemeanors would it not be a defense?    In case of a mob, would he be justified in taking the assurance of a supposed leader that they would not accomplish the act without notifying him?    If an attack is threatened upon A.'s house at night, and A. notifies the sheriff, has he performed his duty when he has seen the supposed leader of the attack, and received his assurance that he will desist?    Perpetrators of these breaches of the peace will always take steps to put the officers off guard, as they evidently did in this case. Section 11337, 3 Comp. Laws 1897, expressly makes it the duty of the sheriff to suppress every unlawful assembly,

and to arrest and secure the offenders; and any neglect upon his part so to do is made a misdemeanor, punishable by fine not exceeding $300. Mr. Parshall testified that he asked plaintiff, " What would be the trouble if we played ?" and that plaintiff replied, " He would have to serve any warrants if any were issued." We cannot shut our eyes to the fact that this has been a common excuse of sheriffs and other police officers for not enforcing this and other laws. It is the duty of the sheriff and police officers generally to enforce those laws which the people have enacted for the protection of their lives, persons, property, health, and morals, including the laws for the observance of the Sabbath.

3. Was the article libelous *per se ?* The acts and conduct of a public officer are open to criticism. The law holds the critic to substantial accuracy in stating the facts upon which his criticism is based. The letter charged plaintiff with an intentional neglect of duty. Such a charge is libelous *per se.* Plaintiff's oath of office was to perform faithfully the duties of sheriff. What that duty was, the violation of which was charged, has already been shown. The statement that "a violation of an oath is always shameful,—particularly so when it relates to official duties," is true. The facts stated do not constitute perjury. The statement based upon them, that, "in legal terms, the violation of an oath is called 'perjury,'" does not, therefore, charge that crime against plaintiff. The three important facts asserted are (1) notification, (2) absence from the scene, and (3) that he had allowed the game to be played. Proof of these would have been a complete justification. Two are conceded, namely, notification and absence. Whether the third was proven depends upon the determination of two questions: *First.* Was plaintiff notified by Parshall that the game would not be played without notifying him? And, *second,* had plaintiff the right to rely upon such a statement of Parshall, in view of all the circumstances and facts of the case ?

4. The court instructed the jury that the mere fact "that a game of ball was to be played at Caledonia Park upon Sunday does not impose upon the sheriff the duty of going there and stopping it or preventing it." It follows from what has been said that this is not the law. Neither the sheriffs, police officers, nor courts can close their eyes to the fact that these games are accompanied with loud and boisterous conduct. They are therefore, *per se*, against that peace and quiet guaranteed to all citizens by the law on the Sabbath day, and the court should have so instructed the jury.

5. The court also said to the jury: "A mere rumor that an offense was to be committed somewhere away from his place would not necessarily take him there." That instruction was not applicable to this case. The information conveyed to plaintiff by these parties was not "mere rumor," either as to time or place. He was notified by them that the game was publicly announced, and that the grounds were in readiness for it. He chose to rely upon the statement of one member of one of the clubs that the game would not be played without notice to him.

6. After defendant had been upon the stand and cross-examined, the following occurred:

"*Q.* Mr. Sweet, did you slide your chair this way and enter into a conversation with Mr. McCurdy at recess?

"*A.* I did.

"*Q.* Did you in that conversation say to him, if we had let you gone into that north-country matter, you would have told something of interest; that you had made the sheriff up there smart, and you would make this man smart before you got done with it? (Objected to as improper.)

"*Mr. Lyon:* I offer it for the purpose of showing malice.

"*Court:* You can answer. (To which ruling the defendant then and there excepted.)

"*A.* May I ask a question?

"*Q.* That is a question I want answered by 'Yes' or 'No.'

"*Court:* He asks me if he may ask me a question. I will allow him to.

"*Witness:* If I have to answer that question, may I not relate the whole conversation?

"*Court:* That you had with Mr. McCurdy?

"*Witness:* Yes, sir.

"*Court:* That will be determined later. I couldn't rule in advance. I don't know what it is. Whatever your rights are, they will be protected in one way or another.

"*Witness:* Let me have the question again. (Question read.)

"*A.* 'If this persecution continues.'

"*Q.* Please answer my question.

"*Court* (to witness): Did you say that?

"*A.* I did; yes."

Redirect examination:

"*Mr. Kilpatrick: Q.* Now you may explain.

"*A.* I said, 'If this persecution continues.'"

We think this testimony was objectionable. It had no reference to the feeling of the defendant at the time of the publication. It related solely to the conduct of the plaintiff in the prosecution of this suit, which the defendant saw fit to call "persecution." It did not tend to show that, at the time of the publication, defendant entertained actual malice towards the plaintiff. It should have been excluded. In view of a new trial, it may be well to state that if defendant was asked on cross-examination about a difficulty with a police officer in Houghton county, for the purpose of attacking his credibility, he should have been permitted to state to the jury the full particulars of that trouble.

7. There was no testimony upon which to base damages of $50 to plaintiff's office. Under that head he could recover only the actual damages. It was not shown that he had lost the service of any papers, or had been damaged at all in the emoluments of his office. He could, therefore, recover only nominal damages.

Judgment reversed, and new trial ordered.

The other Justices concurred.