[1] Reported in 300 N.W. 398.
Certiorari upon the relation of Arthur F. Mesenbrink to review the governor's order removing him from the office of sheriff of Scott county for nonfeasance in the performance of official duty. The governor's authority is not questioned (Mason St. 1927, § 6954), so we may go directly to what relator designates as the "ultimate question for decision," i. e., "Does the evidence furnish any reasonable or substantial basis for the [governor's] decision?"
The operation of slot machines in Scott county is not of recent origin. Relator's deputy, "connected with the sheriff's office * * * close to ten years" and called as his witness, testified that slot machines "have been there for years, even when I wore short pants." Nor was relator unacquainted with this situation, although now he stoutly maintains blissful ignorance of it. Thus we find that prior to the 1940 October term of the district court in that county he "went to the district judge and asked" that a grand jury be called so as "to bring these fellows in that had gambling devices." Pursuant thereto, a grand jury was duly called, and numerous indictments for violations of our gambling laws were returned — more than 20 of them in fact. Convictions were obtained and large fines ($4,500) were imposed. That accomplished, relator apparently felt that he had finished his job. But shortly thereafter Earl A. Olson, a minister of the Methodist church at Jordan, and many people of his congregation, caused a petition to be circulated complaining of gambling devices again appearing in the county. That petition was sent to the governor. It was also published in several newspapers, two in Scott county and the third the Minneapolis Star-Journal, a paper of general and extensive circulation *Page 116 
throughout Scott county and the Northwest. Nothing came of that, however. So, on December 27, 1940, the minister and ten other signers sent a letter to relator informing him of the fact that slot machines were again in operation in the county. They heard nothing from the sheriff, and he did nothing. They then consulted the attorney general, who informed them that the charges were not sufficiently definite and specific. Thereupon and on January 7, 1941, another letter was sent to the sheriff, signed by the 11 persons taking upon themselves the business of cleaning up the county, in which many definitely described places were listed. The cities and municipalities involved included Shakopee, the county seat, wherein relator resided and had so resided over a period of more than ten years while holding the office of sheriff. He concedes that after these letters were received he "made no investigation, either by calling on the persons whose names were signed" to the letters "or by visiting the places named" therein.
That the members of the committee consisted of men and women of credibility and standing in the community is unquestioned. They, or some of them, went to the various municipalities and found slot machines notoriously prevalent. The testimony adduced at the time of hearing before the governor established that fact, and it plainly proved that even up to the time of the hearings before the governor, as late as February 8, 1941, this condition generally prevailed.
Relator denied all knowledge that slot machines were again in operation. His excuse was that he did not frequent such places, and, furthermore, that it was the primary duty of the mayors and the police officers of each municipality to enforce the law; therefore he did not regard it as his duty to investigate, since he considered "it wasn't my duty to snoop around." He further claims that in conferring with the county attorney he was informed that the thing to do was to await arrival of complaints by persons willing "to sign a [criminal] complaint." The county attorney testified that "we [the sheriff and he] always considered it was the *Page 117 
primary duty of the chief of police and mayor of each city and village to enforce the law," and that what the sheriff should do was "to get in touch with them." The county attorney and sheriff had worked and conferred about these matters a number of times.
1. The sheriff's office is an important one, both under the common law and under our statutes. As such he "is made responsible by common and statutory law as conservator of the peace within his jurisdiction." 57 C. J. p. 730 [§ 1] 1. Under our statute, Mason St. 1927, § 907, he is required to "keep and preserve the peace of his county, for which purpose he may call to his aid such persons or power of his county as he deems necessary." Under Mason St. 1940 Supp. § 3200-28, a licensee under the liquor control act is forbidden to possess or operate or to permit the keeping or possession or operation of any slot machine, dice, or any gambling device or apparatus on the licensed premises or in any room adjoining the same. Under § 3200-33(a), "failure on the part of any duly constituted public officer, charged by law with the enforcement of this Act, shall constitute nonfeasance in office and shall be valid ground for the removal of such officer." Under § 3200-53, "every sheriff * * * shall summarily arrest any person found violating any provisions of this Act, and the president or mayor of every municipality shall make complaint of every known violation thereof." And under Mason St. 1927, §§ 10214 and 10215, it is a gross misdemeanor to maintain any "gambling device whatever" in the places there enumerated. The places designated in petitioners' exhibit B are clearly within the statutory prohibition.
2. Neglect of duty in matters of this kind has been held to be "a careless or intentional failure to exercise due diligence in the performance of an official duty." Thus it has been held to include failure to enforce prohibition laws. Many other instances are referred to in 57 C. J. p. 745 [§ 37] (3). Defenses not available may be found Id. p. 747 [§ 42] (c).
3. A public office is a public trust. Such offices are created for the benefit of the public, not for the benefit of the incumbent. *Page 118 
5 Dunnell, Dig. Supp. §§ 7984, 7985, and cases cited under notes. The duties imposed upon all public officers are "functions and attributes of the office, to be performed by the incumbent, though they may have been left undone by a predecessor." Hence it follows that statutory authority compels the exercise of that authority in conformity with the statute.Id. § 7998.
4. Where, as here, the operation of slot machines was open and notorious within the corporate limits of the cities and villages of Scott county, including the county seat, where relator resides and has his office, his claim of ignorance of what everyone else knew about this situation cannot excuse him. His statutory duties and his obligations to the public cannot be discharged by willful failure to see the obvious. He may not shut his eyes or close his ears to what others see and hear. As sheriff he has a duty to be active and vigilant and to use all proper efforts to secure obedience to the law. Information of offenses received from responsible sources cannot be ignored. He is "the chief magistrate of his county, wielding the executive power for the preservation of the public peace, and it has been held that the duty of a sheriff in the enforcement of the law implies initiative on his part, and that he must be reasonably alert with respect to possible violations of the law, and is not entitled to wait until they come to his personal knowledge, but must follow up information received from any source." Farmers Mut. F. Assn. v. Hunolt (Mo.App.)81 S.W.2d 977, 981. Here, as in Scougale v. Sweet, 124 Mich. 311,323, 82 N.W. 1061, 1065, where an excuse was made similar to that here offered by relator, that "he would have to serve any warrants if any were issued," the court said:
"We cannot shut our eyes to the fact that this has been a common excuse of sheriffs and other police officers for not enforcing this and other laws. It is the duty of the sheriff and police officers generally to enforce those laws which the people have enacted for the protection of their lives, persons, property, health, and morals, including the laws for the observance of the Sabbath." *Page 119 Cf. Barbee v. Murphy, 149 Va. 406, 416, 141 S.E. 237, 240; Maxwell v. Andrew County (Mo. Sup.) 146 S.W.2d 621, 624,625.
Writ discharged and order affirmed.