State v. Reichman.

STATE EX REL. THOMPSON, ATTY. GEN. *v.* REICHMAN.

(*Jackson.*   April Term, 1916.)

1. SHERIFFS AND CONSTABLES.  Title to office.  Ground for removal.

A sheriff who has made an honest and reasonably intelligent effort to do his duty will not be removed by the courts, though his efforts may not have been wholly successful, his right to continue in office depending rather on the good faith of his efforts than on the degree of his success. (*Post, pp.* 692-697.)

Case cited and approved: State v. Howse, 134 Tenn., 89.

Cases cited and distinguished: South v. Maryland, 18 How., 396; Scougale v. Sweet, 124 Mich., 323.

2. SHERIFFS AND CONSTABLES.  Powers and duties.  Notice of violation of law.

When a sheriff learns that a city in his county is collecting tribute from numerous liquor dealers and leaving them otherwise undisturbed, this is notice to him that the law is being violated and no effort made to enforce it. (*Post, pp.* 697-700.)

Case cited and approved: Jones v. State, 100 Ala., 90.

3. ARREST.  Without warrant.  Duties of sheriff.

While a sheriff need not make a forcible entrance into a suspected residence or place of business to discover violations of the liquor law, he or his deputies should enter open saloons and make arrests if justified by what they see therein. (*Post, pp.* 697-700.)

4. BREACH OF THE PEACE.  Elements.  "Peace."

The word "peace," in the phrase "breach of the peace," means the tranquility enjoyed by the citizens of a municipality or community where good order reigns among its members; that invisible sense of security which every man feels necessary to his comfort, and for which all governments are instituted. (*Post, pp.* 700-706.)

---

State v. Reichman.

---

Cases cited and approved: Galvin v. State, 46 Tenn., 294; Davis v. Burgess, 54 Mich., 517; State v. Coffin, 64 Vt., 27; People v. Ruggles, 8 Johns. (N. Y.), 290; Lindenmuller v. People, 33 Barb. (N. Y.), 548; State v. O'Rourke, 35 Neb., 614.

Cases cited and distinguished: Jones v. State, 100 Ala., 90; Ware v. Branch Circuit Judge, 75 Mich., 493.

5. BREACH OF THE PEACE. Elements. Violation of statute. "Breach of the peace," in view of the generally accepted definition, and of constitutional provision that all indictments shall conclude, "against the peace and dignity of the State," includes any violation of any law enacted to preserve peace and good order. (*Post, pp.* 700-706.)

6. INTOXICATING LIQUORS. Offenses. Statutory provision. Shannon's Code, Sec. 993, subsec. 2, requiring every applicant for a liquor license to give bond to keep a peaceable and orderly house, is a legislative declaration that the liquor law is intended to preserve the peace, so that any violation thereof is a breach of the peace. (*Post, pp.* 706-710.)

Case cited and approved: Dyer v. State, 19 Tenn., 250.

Code cited and construed: Sec. 993, subsec. 2 (S.).

7. INTOXICATING LIQUORS. Offenses. Nuisance. Breach of the peace. Engaging in the sale of intoxicating liquors, declared by Act 1913 (2d Ex. Sess.) chapter 21, to be a nuisance, is among that class of nuisances always treated by the court as tending to disturb the peace and good order of the community. (*Post, pp.* 710-713.)

Cases cited and approved: Childress v. Mayor & Aldermen, 35 Tenn., 358; State v. Graham, 35 Tenn., 134; Delk v. Commonwealth, 166 Ky., 39.

Cases cited and distinguished: Graham v. State, 134 Tenn., 285; Legg v. Anderson, 116 Ga., 401; State v. Tabler, 34 Ind. App., 393.

State v. Reichman.

8. **SHERIFFS AND CONSTABLES. Powers and duties. Enforcement of law.**

That Acts 1913 (2d Ex. Sess.) chapter 2, declaring a saloon a nuisance, provides a method for its abatement, merely furnishes a cumulative remedy, and does not abrogate any other remedy or affect a sheriff's duties. (*Post, p.* 713.)

9. **INTOXICATING LIQUORS.   Offenses.   "Disorderly house."**

A saloon run in violation of law is a "disorderly house," which is defined as any place where illegal practices are habitually carried on; and hence a saloon open, equipped, and ready for business is a threat to breach the peace, if not in itself a breach of the peace. Citing Words & Phrases, Second Series, Disorderly House. (*Post, pp.* 713, 714.)

10. **BREACH OF THE PEACE.   Elements.   Violence.**

It is not necessary that an act have in itself any element of violence in order to constitute a breach of the peace. (*Post, pp.* 714-731.)

Cases cited and approved: Davis v. Burgess, 54 Mich., 517; Roberson v. State, 43' Fla., 156; Judy v. Lashley, 50 W. Va., 628; Hurd v. State, 119 Tenn., 584; McLennon v. Richardson, 15 Gray (Mass.), 74; Cornett v. Commonwealth, 78 S. W., 858; Delk v. Commonwealth, 166 Ky., 39; Scougale v. Sweet, 124 Mich., 311; Yerkes v. Smith, 157 Mich., 557; In re Kellam, 55 Kan., 700.

Cases cited and distinguished: Davis v. Burgess, 54 Mich., 517; State v. Warner, 34 Conn., 276; Ware v. Branch, 75 Mich., 496; Robinson v. Miner, 68 Mich., 549; In re Carroll, 12 Wkly. Law Bul. (Ohio), 9.

11. **SHERIFFS AND CONSTABLES. Powers and duties. Arrest.**

On making an arrest for a threatened violation of the liquor law, the sheriff should take such steps as are necessary to prevent the threatened sales, as, in case of a saloon open for business, by closing it till the liquors are removed, and then release the offender and leave future sales and future threats to be dealt with as they arise. (*Post, pp.* 731-737.)

Case cited and approved: Shanley v. Wells, 71 Ill., 78; O'Connor v. Bucklin, 59 N. H., 589; Ross v. Leggett, 61 Mich., 445; Ex parte Morrill, 35 Fed., 261.; McCrowell v. Bristol, 73 Tenn., 685.

Cases cited and distinguished: Eilenbecker v. District Court, 134 U. S., 31; Spalding v. Preston, 21 .Vt., 9; Quinn v. Heisel, 40 Mich., 578.

12. **SHERIFFS AND CONSTABLES.** Powers and duties. Willful neglect.

In proceedings to remove a sheriff for failure to enforce the liquor law, he is precluded, by his admission that he did nothing in a city within his county but to serve process where liquor was openly sold in violation of law, from asserting that no willful neglect of his duty has been shown. (*Post, pp.* 737-739.)

ON PETITION TO REHEAR

Appeal from the Chancery Court of Shelby County. —F. H. HEISKELL, Judge.

G. T. FITZHUGH and F. M. THOMPSON, Attorney-General, for appellant.

T. K. RIDDICK and C. M. BRYAN, for appellee.

MR. W. L. FRIERSON, Special judge, delivered the opinion of the court.

In a very earnest petition to rehear we are asked to reconsider our opinion in which it was held that the defendant should be removed from the office of sheriff of Shelby county.

State v. Reichman.

When the cause was heard three members of the court were absent and their places occupied by special judges. In view of this fact, an oral argument of the petition has been permitted, and the conclusions now announced reached by the court, composed of four regular members and the writer sitting as a special judge.

As counsel seem to be under some misapprehensions, we will restate briefly what was decided.

The facts which we held justified defendant's removal were these:

(1) During the Tri-State Fair, which was held in September, 1914, in Shelby county outside the corporate limits of the city of Memphis, intoxicating liquors were sold openly on the fair grounds, and he was present and took no steps to prevent it, although he had previously said that to permit it would be to prostitute his office.

(2) During his term as sheriff, although, with the exception above stated, he made an honest effort to enforce the liquor laws in the rural districts, he did nothing toward enforcing them in the city of Memphis, except to serve such process as was placed in his hands, in spite of the fact that during at least a part of the time there were a great many open saloons running, and he knew that during a portion of his term the city authorities were doing nothing either to prevent or punish violations of the liquor laws, and during another part of his term they were merely

135 Tenn.—44

arresting liquor dealers, requiring, in each case, the payment of $50 to the city, and binding no one over to the grand jury, but leaving offenders undisturbed in their places of business, and immune from punishment under the laws of the State.

None of these facts have been challenged by the petition to rehear or the argument in support of it except it is insisted that, though liquor was being sold in many places, there is "no definite and sufficient proof" that any of these places were open saloons, or, if so, that defendant knew of them. But this contention does not deny that he knew that the city authorities were, in effect, shielding numerous offenders from prosecution by exacting tribute to the city and leaving them free to continue their unlawful business. He, therefore, knew that, to the extent of protecting them from punishment in the State courts, the city officials were in league with the offenders. We are, however, entirely satisfied that, at least for a considerable time before this proceeding was commenced, there were many open saloons in Memphis, not a few of them in the business section of the city, and some of them being conducted with such openness that sales over the bar could be observed from the street. The record shows that there were numerous places in Memphis where complete strangers could and did go, and, without question or difficulty, purchase intoxicating drinks, and have them served just as such drinks are ordinarily purchased and served in saloons, and that many of them had all the well-

known *indicia* of open saloons. And the evidence leaves no doubt that these facts were generally known in the community. We have accepted as true defendant's statement that he was not in a saloon during his term and did not actually see a sale of liquor. Indeed we have found, in the record, no reason to doubt his entire truthfulness as a witness. But his testimony, as a whole, admits a knowledge that the city authorities were permitting liquor dealers to continue their business upon the payment of an occasional $50, and contains no denial of the circumstances shown from which he could have had no doubt that these laws were being ignored and extensively violated. And the slightest effort would have given him actual knowledge of the conditions. The saloons were as open to him as to the public. In entering them, he would no more have been a trespasser than any other citizen. The record satisfies us that the persons in charge of these places felt perfectly secure from interference by the sheriff or his deputies, and that their appearance would have caused no suspension of operations and they could easily have seen what the other witnesses saw. The conclusion must be that he did not see open saloons and liquor sales because it was not his policy to see them. That this was, in fact, his attitude is obvious from the testimony that on one occasion he learned that the city authorities had arrested, for liquor selling, the keeper of a place where some of his deputies were accustomed to eat lunch and advised them not to go there any more.

Under these circumstances it cannot be unfair to hold him to the duties which rest upon a sheriff who knows that saloons are being run openly in his county. We have accordingly based his removal upon his total and intentional neglect of any effort to suppress saloons or other places where liquor was sold openly.

We have not undertaken to determine what degree of failure to suppress bootlegging or other secret methods of selling liquor would justify the removal of a sheriff. It is sufficient now to say that the law is not unreasonable and does not require impossibilities of the sheriff any more than of any other person. The inquiry always must be whether he has made an honest and reasonably intelligent effort to do his duty. If he has done this, the courts will not remove him, though his efforts may not have been wholly successful. In other words, his right to hold his office depends upon the good faith of his efforts rather than upon the degree of his success. The fact that a few or many violations of the law have occurred in his county will never, without more, justify his removal. His good faith, or lack of it, must be determined by the circumstances of each case. In the present case we are relieved of the necessity of going into these questions, because we are dealing with a defendant who expressly admits facts which show that, so far as the city of Memphis is concerned, he had every reason to believe that the law was being constantly violated and made no effort to do anything.

State v. Reichman.   .

In concluding that the facts stated above required defendant's removal, we made the following rulings as to the duties of a sheriff:

(1) He is the chief conservator of the peace in his county and expressly required to keep the peace, and to prevent and suppress public offenses and breaches of the peace.

(2) Ordinarily he may rightfully assume that the police officers of incorporated towns and cities will do their duty, and hence will be guilty of no serious neglect of duty if he gives but little attention to police matters in such places. But if he knows, or has reason to believe, that they are neglecting their duty or are in league with offenders, his duties are the same as in the rural districts.

(3) He is not a mere process server, but his duties require initiative on his part in the enforcement of laws against public offenses. It is therefore his duty to exercise the powers conferred upon him, and to use the means provided by law to accomplish the prevention and suppression of public offenses.

(4) He must use a reasonable degree of diligence to inform himself of conditions in his county, and will be derelict if he shuts his eyes to what is generally known in the community, or purposely avoids information, easily acquired, which will make it his duty to act.

(5) If he has notice of any public offense, it is his duty to act in its prevention.

With respect to the means which the law affords for the performance of these duties, we held:

(1) For any public offense committed in his presence the sheriff may, without a warrant, arrest and take before a justice of the peace the offender for punishment.

(2) For a misdemeanor committed, but not in his presence, he has no authority to arrest without a warrant.

(3) To prevent any offense, which is also a breach of the peace, *threatened* in his presence, he may arrest without a warrant and use such force as may be reasonably necessary to prevent the threat being carried into execution.

(4) If he knows or has reason to suspect that any person *is armed* for the purpose of committing certain offenses, he may arrest without a warrant and take before a justice of the peace such person, to the end that a bond to keep the peace may be required.

(5) Except as just stated, he is in no case authorized to make an arrest without a warrant, upon suspicion or information received from others that a misdemeanor, whether also a breach of the peace or not, has been committed or is about to be committed.

(6) He has no authority to swear out a warrant merely upon facts of which he has been informed by others. In such cases he may report the matter to the grand jury, with the names of his informant and such other witnesses as may be known to him.

(7) But if he knows of his own knowledge such facts as reasonably make a case, he may himself swear out a warrant and then arrest the offender.

The authorities were cited in our former opinion. And the rulings as stated are not now questioned, except in so far as they impose upon the sheriff the duty of taking the initiative. It is conceded that his powers are correctly set out above. But it is denied that he is under any positive duty to exercise these powers, at least when, though having notice of offenses, he does not actually see an unlawful act. But this involves a total misconception of the nature of the office of sheriff as it has been known to the law from time immemorial.

"The powers and duties of conservator of the peace exercised by the sheriff are not strictly judicial; but he may be said to act as the chief magistrate of his county, wielding the executive power for the preservation of the public peace." *South* v. *Maryland,* 18 How., 396, 15 L. Ed., 433.

He is, "in his county or bailiwick, the representative of the king or sovereign power of the State to preserve the peace." 25 Am. & Eng. Enc. of Law, p. 662. The chief magistrate clothed, in his county, with the executive power of the State, the representative of the king, or, in America, of the sovereignty of the State, cannot be said, with any show of reason, to be a mere process server who may stand passive and see the laws of the State trampled upon unless some citizen places process in his hands directing him to

act. For the punishment of offenses which injure a citizen in his person or property we may sometimes expect the injured person to start the machinery of the law. But for the enforcement of those laws intended for the protection of the public at 'large, and in which no one citizen has any more direct interest than another, practically the sole reliance must be upon those officers who are made the guardians of the peace of the State, chief among whom is the sheriff.

Answering the suggestion that a sheriff could discharge his duty by standing ready to serve any warrants that might be issued, the Supreme Court of Michigan has said:

"We cannot shut our eyes to the fact that this has been a common excuse of sheriffs and other police officers for not enforcing this and other laws. It is the duty of the sheriff and police officers generally to enforce those laws which the people have enacted for the protection of their lives, persons, property, health, and morals." *Scougale* v. *Sweet,* 124 Mich., 323, 82 N. W., 1065.

That case is also authority for the statement that, when information comes to the sheriff that an offense is about to be committed, it is his duty to make an honest, and not a pretended, effort to ascertain the facts and be at the place to prevent the offense. This is all in accord with our ruling. And we are satisfied that we have not charged the defendant with any higher measure of duty than the law imposes on him. When the statute directs him to prevent and suppress

public offenses, and says that when he has notice of such offenses, it is his duty to act in prevention of them, it plainly intends that he must use all, or so much as may be necessary, of the means to that end which are at his command.

Applying these rules, we held that defendant was guilty of a distinct neglect of duty in making no effort to prevent the sale of liquor at the Tri-State Fair. The facts as we have stated them are not challenged by the petition to rehear. It cannot be said that this neglect was not knowing and willful, for he himself had previously said it would be a prostitution of his office. His removal could well have been rested upon this alone.

But it was not necessary to base our decision upon a single isolated failure to do his duty, occurring at the beginning of his term. In view of the facts, as we have found them, his admission that he did nothing in the city of Memphis toward enforcing these laws furnishes ample reason for his removal. *State* v. *Howse,* 134 Tenn., 89, 183 S. W., 510.

When he learned, as he did, that the city was collecting tribute from numerous liquors dealers and leaving them otherwise undisturbed in their places, this was notice to him that the law was being constantly violated, and that no proper effort was being made to suppress the offenses or punish the offenders. The slightest desire to perform the duty which we have held was his would have suggested a visit to these places. His offense was in keeping away

from places where he had every reason to believe that the laws were being violated. It was the offense of willful neglect of duty rather than positive wrong-doing. For an officer to purposely avoid being where he has reason to believe that an offense will be committed is as serious and willful a neglect of duty as a failure to arrest for an offense committed in his presence. The decision could well be rested upon his failure, with the notice he had to locate these saloons or at least some of them. We do not mean that it was his duty to break open any doors, or to make a forcible entrance into any suspected residence or place of business for the purpose of searching. Dealing with the case before us, we merely hold that he had the same right that the general public had to enter these places and observe what was open to observation, and that it was then his duty to take such action as would be justified by what he saw. If he had taken this course, the result cannot be doubted. At least until some arrests had been made, we are satisfied that all he or his deputies had to do was to walk into these places, observe sales, and make arrests. He neglected to make the attempt. Of course, when it became known that the sheriff's office proposed to do its duty, precautions would be taken to avoid making sales in the presence of the officers. If then the officers should see no sales made, but should find a federal license displayed, and observe other facts reasonably showing that sales had been made, they could swear out warrants. If, how-

State v. Reichman.

ever, they should not discover facts sufficient to make a *prima facie* case, but found circumstances leading them to believe that the law had been violated, they could report the matter to the grand jury, with the names of such witnesses as they could furnish. And it would be their duty to do such of these things as might, under the circumstances, be necessary. In the present case the defendant neglected to take the first step by going or sending his deputies to the places where he had reason to believe liquor was being sold. But this neglect, of course, cannot excuse him for not doing the things which it would have been his duty to do if he had taken the first step. He must therefore stand convicted of a neglect of all the duties which would have been his if he had gone to these saloons. What has been said thus far applies whether the offense in question is or not also a breach of the peace. We have but stated the long-recognized duties of a sheriff with respect to all public offenses. But in the case of an open saloon, if no sale is made in the presence of an officer, if no federal license is displayed, and he acquires no such knowledge as will justify him in swearing out a warrant for past sales, but he finds a stock of liquors, complete bar equipment, and such a state of preparedness as to make it certain that sales will be made as soon as his back is turned, must he leave the person in charge undisturbed, and let the enforcement of the law await the slow process of an investigation by the grand jury? We cannot think so. In the presence of such an un-

equivocal threat, must the chief law officer of the county, charged with the duty of preventing such offenses, wait until the offense has actually been committed? We cannot agree that the law is so impotent. The sheriff is expressly authorized by our statute to take preventive measures when a breach of the peace is *threatened* in his presence, and, to that end, to make an arrest without a warrant. After a review of the authorities, and a consideration of the manifest purpose of the legislature, throughout the history of the State, in the passage of liquor laws, we held that the unlawful sale of intoxicating liquors is a breach of the peace which it is the duty of the sheriff to prevent when threatened in his presence, and that a saloon, stocked with liquors, fully equipped and ready for business, is such a threat. It is against this holding that the petition to rehear is chiefly directed.

If a violation of the law against the sale of liquor is a breach of the peace, it is conceded that an officer may, without a warrant, arrest for a violation of that law threatened in his presence. And it will scarcely be doubted that the maintenance of a saloon, ready for business, constitutes such a threat. It has been said that any act which reasonably threatens such a violation justifies an arrest as for a threat. *Jones* v. *State*, 100 Ala., 90, 14 South., 772. The inquiry then is narrowed to the question as to what constitutes a breach of the peace within the meaning of our statute.

It must be remembered that the term "breach of the peace" is not used to describe any specific crime

or offense. It is generic and embraces many acts which are indictable as separate offenses. Speaking generally, the definition adopted in *Galvin* v. *State*, 6 Cold., 294, according to which it includes all unlawful acts and acts of public indecorum which disturb, or tend to disturb, public peace or good order, is that which is laid down in all text-books and accepted by practically all courts. It has been succinctly described as "a criminal act of the sort which disturbs the public repose." 1 Bishop's Criminal Law, section 536. A great multitude of cases, from almost every State in the Union, in which substantially this definition has been adopted, could be cited. But this is unnecessary, since, we believe, there is no dissent from the general definition. The only difficulty is in applying it to particular facts. It seems to be clear, then, that any act which is unlawful, and which disturbs or tends to disturb peace and good order, is within the accepted definition of a breach of the peace. And the word "peace" in this connection has also come to have a fixed meaning. It means, "the tranquility enjoyed by the citizens of a municipality or community where good order reigns among its members," or, "that invisible sense of security which every man feels so necessary to his comfort, and for which all governments are instituted." *Davis* v. *Burgess*, 54 Mich., 517, 20 N. W., 540, 52 Am. Rep., 828; *State* v. *Coffin*, 64 Vt., 27, 23 Atl., 632.

The difficulty in applying this general definition to particular facts will, we think, largely disappear if

we will bear in mind the distinction between those breaches of the peace which are offenses against individuals, and those which are offenses only against the public at large or the State, and remember that what is said of the one class is not necessarily true of the other.  Thus it has been said:

"The offense may consist of acts of public turbulence or indecorum, in violation of the common peace and quiet, or of an invasion of the security and protection which the law affords every citizen, or of acts such as tend to excite violent resentment.  Actual personal violence is not an element of the offense, but when the incitement of terror or fear of personal violence is a necessary element, the conduct or language of the wrongdoer must be of a character to induce such condition in a person of ordinary firmness."  5 Cyc., p. 1024.

By this we understand that there are some breaches of the peace in which the "incitement of terror or fear of personal violence is a necessary element," and, as to these, the act complained of must be such as to reasonably produce terror or fear.  They consist of offenses which invade the security and protection which the law affords the individual citizen, and as to which it is sometimes, and probably generally, held that there must be some kind of violence, either actual or threatened.  But the language quoted clearly implies that there is a class of breaches of the peace into which the element of incitement to terror or actual fear does not enter, but which are offenses merely

State v. Reichman.

because they are incompatible with the tranquility and good order which governments are organized to maintain.

The distinction is well illustrated in *Ware* v. *Branch Circuit Judge*, 75 Mich., 493, 42 N. W., 998, where it was said:

"It is a significant fact that very few, and it may perhaps be said that none, of the recognized books of authority on the criminal law contain any such title as 'Breach of the Peace,' with a definition of it. The books almost universally divide crimes into classes; and breaches of the peace, so far as they are found defined at all, are found either as offenses against the lives and persons of individuals, or as public disturbances, except where for certain reasons they are made felonies."

And in the same case the court said:

"The only cases of breach of the peace, not involving open disturbance in public places, and to the actual annoyance of the public at large, or persons employed, and actually engaged in public functions, require personal violence, either actually inflicted or immediately threatened."

Thus those acts which are breaches of the peace because they are disturbances in public places, or because they are an annoyance to the public at large or persons engaged in public functions, are carefully excluded from the rule requiring violence, actual or threatened, as an element of the offense. Those offenses described as an annoyance to the public at

large include those which are "a gross violation of decency and good order," *People* v. *Ruggles*, 8 Johns. (N. Y.), 290, 5 Am. Dec., 335; "acts which tend to corrupt the morals and debase the moral sense of the community," *Lindenmüller* v. *People*, 33 Barb. (N. Y.), 548; and those which furnish an "evil example of a defiance of the law," *State* v. *O'Rourk*, 35 Neb., 614, 53 N. W., 591, 17 L. R. A., 830.

In *Ware* v. *Branch*, supra, the offense sought to be punished as a breach of the peace consisted of obscene language used by one in the home of another. There was no element of threat or fear. Speaking o fthe offense, the court said:

"As described, the performance was the vaporing of a filthy minded person whose tongue was loosed by drinking, and who was certainly an unsavory and undesirable visitor, but nothing legally worse."

There was no claim that the conduct complained of was a public disturbance, for it was said:

"The only ground on which relator has endeavored to base a claim of breach of the peace is that this language was calculated to provoke violence."

The court was therefore dealing with an alleged breach of the peace of the class which invades the rights of individuals. Hence what was said as to the necessity for violence must be referred to that class, and has no application to the class consisting merely of offenses against the public or the State. The courts have not always kept this distinction in mind, and to this fact is due whatever confusion may be found in the authorities.

· In England the sheriff was the keeper of the King's peace. In America he is the keeper of the peace of the sovereign people or the State. We think it cannot be said that this peace of the sovereign is not breached or disturbed by any infraction of the laws, at least those enacted for the purpose of preserving good order. It is in this broad sense, we think, that the term is used in the statute authorizing arrests for threatened breaches of the peace. We have no statute which undertakes to define breaches of the peace, and no statute attempting to enumerate all offenses which are breaches of the peace. But our Constitution (article 6, section 12) provides that all indictments shall conclude, "against the peace and dignity of the State." It is difficult to construe this otherwise than as a constitutional declaration that every indictable offense shall be regarded as against the peace of the State; that is, a breach of the peace. And when we remember that every unlawful act which tends to disturb good order is a breach of the peace, what can be more logical than to say that every violation of a criminal law is a breach of the peace of the State? How, in a country where law is supreme, can an act be at once orderly and criminal? If this be the meaning of the Constitution, then an officer is authorized to arrest for any indictable offense threatened in his presence. And this is the construction placed upon the statute of Alabama, from which ours was copied, by the courts of that

135 Tenn.—45

State.   We quote from *Jones* v. *State,* 100 Ala., 90, 14 South., 773:

"It is alike the law and common knowledge that such officers' may arrest without warrant, either to preserve peace and good order or to prevent a threatened violation of the law. . . . The officer may arrest upon seeing such acts as show a reasonable ground for making the arrest; and an act done in his presence which is violative of a general law, or of a municipal ordinance, or which reasonably threatens such violation, authorizes arrest without warrant."

We are aware, however, that there are authorities which recognize some violations of law as not involving a breach of the peace, and it is not necessary for us now to decide whether, under our Constitution and statutes, this distinction exists.   Certainly it cannot be denied that a law enacted to preserve peace and good order is a legislative declaration that the prohibited act at least tends to disturb good order. And the infraction of such a law must be a breach of the peace.

That our liquor laws have been enacted for the preservation of peace and good order will scarcely admit of a doubt.   From the earliest history of the State, the legislature has recognized the unrestricted retailing of intoxicating liquors as wholly inconsistent with peace and good order, and has placed upon it restrictions and regulations not deemed necessary in the case of any other business.   As early as 1838, this court, speaking through Judge Turley, reviewed

the legislation on the subject from 1779 up to that
date, and showed that the retailing of intoxicating
liquors had always been regarded as dangerous to
public peace and productive of disorder; that there
had never been a time in Tennessee when persons
were permitted to engage in it except under regula-
tions intended to minimize the evils and disturbances
known to flow from it; that, with ever increasing
anxiety, the legislature was constantly imposing new
regulations upon the traffic; that the effort at first
was to confine "this dangerous privilege" to persons
of probity and trust by permitting none to exercise
it except persons who had obtained a license to keep
an ordinary; that this proving insufficient "to con-
trol within proper limits the evils resulting from re-
tailing spirituous liquors," it was confined to those
who could satisfy the county court that they were of
sufficient probity and not addicted to any gross immo-
rality; that this failed to accomplish the desired pur-
pose, and the legislature, "being determined to find
a remedy for the evil," enacted that the privilege
should be confined to those who could, by creditable
witnesses, show that they were of good moral char-
acter and were provided with bedding, stables, and
house room for the accommodation of lodgers and
travelers, and that their design was in good faith to
keep a house of public entertainment, and that the
retailing of liquors was not the principal object in
asking a license; that the taxing of the privilege was
next tried; that almost immediately the placing of

further restrictions upon the business was begun by requiring an oath not to sell to slaves and not to permit gaming on the premises. *Dyer* v. *State,* 19 Tenn. (Meigs), 250.

A mere recital of these acts leaves no doubt that the legislature was all the time struggling to guard against and minimize the breaches of the peace which it recognized as inevitably resulting from, at least, the unrestricted sale of intoxicating liquors. This view is confirmed by subsequent acts, too numerous to mention, by which sales were prohibited at places and on occasions when and where breaches of the peace would be most annoying and dangerous to the public, and peace and order most important.

It may be said that the chief purpose of the original four-mile law was the protection of the morals and habits of the youth of the State while attending colleges and universities. As the prohibition was only against sales within four miles of incorporated institutions of learning, this may be true, though, we think, there was also present in the legislative mind a purpose to protect these institutions from the disorders and disturbances of the peace which had been found to attend the sales of liquor in their vicinity. But whatever may be said of the purpose of the original act, no doubt can be entertained of the legislative purpose in passing the acts by which its operation was extended. It is a part of the history of the State that the object in the first extension, was to rid the people of crossroads groceries, with their attendant

State v. Reichman.

turbulence and disorder, which had become a menace to the peace of almost every rural community, and that the idea of the four-mile law was seized upon to accomplish that result.  So productive of disorder did the legislature evidently regard the business of selling liquor that it was thus confined to where the public could have the police protection afforded by incorporated towns and cities.  These laws, as well as numerous ordinances passed by towns and cities, were upheld by this court as enacted for the preservation of peace and good order.  And when, after years of trial, the legislature extended the law so as to make it apply to towns and cities, the conclusion would seem to be that it decided that, in the presence of liquor selling, even such police protection was not sufficient to preserve the peace as it should be preserved.

We are not unmindful that considerations of morals and health also enter into the passage of such measures.  But the fact that other considerations have combined with a purpose to preserve the public peace and order do not denude them of their character as peace measures.

But, if any express legislative declaration was necessary to give these laws the character we have ascribed to them, we have such a declaration in a statute to which we have not yet referred.  After prohibiting the retailing of liquor without a license, the legislature enacted, in effect, that a license should be issued to no person until he should have given a bond to keep the peace in his place of business.  We

refer to Shannon's Code, section 993, subs. 2, by which the applicant for a license is required to give a bond, one of the conditions of which is that he will ''keep a peaceable and orderly house.'' This act has never been repealed, and the present prohibition against selling liquors is confined to places within four miles of a schoolhouse. If, therefore, a place can be found not so located, the business may still be lawfully conducted, but no one is permitted to engage in it without giving the required bond. We thus have the legislature's characterization of the privilege of selling intoxicating liquors as a beverage as one attended with so much danger to the peace of the community that those who would exercise it must first protect the public by giving a bond to keep the peace.

There can, we think, be no doubt that an act which the legislature has, since the earliest days of the State, permitted to be done only under such restrictions as it was thought would preserve the peace, as a condition to the doing of which it has required a bond to keep the peace, and which it has finally prohibited altogether, is necessarily a breach of the peace. We can conceive of no clearer case of a breach of the peace than an act which the legislature has first permitted to be done only under a peace bond and then has prohibited.

Again, the legislature has by the act of 1913 declared the engaging in the sale of intoxicating liquors to be a public nuisance, and we cannot escape the conclusion that it belongs to that class of nuisances

which this court has always treated as tending to disturb the peace and good order of the community. Long ago it was held that such public nuisances as bawdyhouses "endangers the public peace and good order, by drawing together profligate and disorderly persons" (*Childress* v. *Mayor & Aldermen,* 3 Sneed, 358), and that "generally any practices tending to disturb the peace and quiet of communities, or corrupt the morals of the people, are indictable as public offenses by the common law." *State* v. *Graham,* 3 Sneed, 134. And the language last quoted was cited in the very recent case of *Graham* v. *State,* 134 Tenn., 285, 183 S. W., 983, in support of the holding that the conducting of moving picture shows on Sunday was a public nuisance and an indictable offense. In the latter case, replying to the contention that it was not shown that the public had been disturbed, the court, through Mr. Justice Buchanan, said:

"The proof in the present case makes it clear that the picture-show business of the plaintiff in error was conducted by him on successive Sundays, to the observance of passers-by in the matter of seeing the large crowds going in and out of the show, and the show was located on Market street, a leading thoroughfare of the city of Chattanooga."

Clearly, open saloons, at least when conducted in violation of law, in the same way as bawdyhouses, "endanger the public peace and good order by drawing together profligate and disorderly persons." And certainly, if the peace and quiet of the community

is disturbed by seeing crowds going in and out of picture shows on Sunday, less cannot be said of lawless saloons along public streets. On all days except Sunday, picture shows are lawful and the passing in and out of them of orderly crowds has no tendency to disturb peace and tranquility. A different rule applies on Sunday, because the law secures to the public a higher degree of peace and quiet on that day than on other days. The principle is that that is a disturbance of the peace which interferes with the degree of peace and quiet which the law contemplates shall prevail at a particular time and place; hence the well-recognized rule that what may not be a breach of the peace at one time and place may very well be such a breach at another time and place. *Delk* v. *Commonwealth,* 166 Ky., 39, 178 S. W., 1129, L. R. A., 1916B, 1117. The constant violation of the Sunday laws, by acts entirely lawful and orderly on other days, disturbs the peace and tranquility of the community because it is a flaunting in the face of the public of a disregard for the laws of the land and the rules of organized government. The open violations of laws intended to preserve peace and good order necessarily breed in the public mind a feeling of insecurity, and thus disturb the peace and tranquility of the community. When we apply these principles to an open saloon, at a place where it is unlawful to sell liquor at any time, the conclusion is obvious. Such a place is a constant disturber of peace and good order. Nor are we without high authority

State v. Reichman.

from other States for this conclusion. The Supreme Court of Georgia has said:

"A place where intoxicating liquors are sold in violation of law is a menace to the peace, good order, and happiness of any community, and legislation declaring such a place to be a public nuisance is wise and salutary." *Legg* v. *Anderson,* 116 Ga., 401, 42 S. E., 720. See, also, *State* v. *Tabler,* 34 Ind. App., 393, 72 N. E., 1039, 107 Am. St. Rep., 256:

It is said, however, that the act declaring a saloon a nuisance provided the method by which such nuisances should be abated, and that the sheriff is not authorized to institute proceedings for that purpose. But the remedy provided is merely cumulative and does not abrogate any other remedy. It is rather to be used when, through the neglect of officials or for other reasons, the law is not being enforced in the ordinary way. The sheriff's duties are therefore the same that they were before the passage of that act. And the declaration of the act that the conducting of a saloon is a nuisance was nothing more than a restatement of what was already the law. Ever since the sale of intoxicating liquors as a beverage has been unlawful, the open saloon has been a public nuisance of that class which disturbs the public peace.

Another line of authorities leads to the same conclusion. There can, we think, be no disagreement with the statement that the keeping of a disorderly house is a breach of the peace. The accepted definition of a disorderly house is, "Any place where illegal

practices are habitually carried on is a disorderly house." 2 Words and Phrases (Second Series) 76, citing numerous cases. These authorities establish the rule that a place in which liquors are sold in violation of either prohibitory or regulatory statutes is a disorderly house. And, as we have seen, when saloons were permitted under the law, our own legislature regarded them as so likely to be disorderly houses that every applicant for license was required to give bond to keep a peaceable and orderly house. We entertain no doubt, therefore, that in Tennessee a saloon open, equipped, and ready for business is a threat to breach the peace if it is not in fact, itself a breach of the peace.

Whatever may be thought of a single sale of liquor as a breach of the peace, there can be no doubt that the running of an open saloon in defiance of a law is a nuisance of the class that disturbs public order, and that such a place is a disorderly house. A bawdyhouse, as we have seen, is a menace to peace and good order, and therefore a breach of the peace. And counsel for defendant themselves put the unlawful sales of liquor in the same class by coupling them with "the kindred and concomitant offenses of gambling and keeping bawdyhouses."

The argument is now made, however, that violence, actual or threatened, is a necessary ingredient of a breach of the peace, and several authorities are pressed upon our attention. If it is meant by this that the act complained of must either itself be vio-

State v. Reichman.

lent, or of such a nature as that its tendency is to provoke or incite or lead others to violence or turbulence of some kind, the contention is correct as to those breaches of the peace which invade the security and protection of individuals. But the insistence seems to be that no act can be a breach of the peace which has not in itself some element of violence. And to this we cannot agree. Such a holding would exclude the possibility of a breach of the peace by the use of words, no matter how certain it is that such words will provoke violence, and many other acts universally recognized as breaches of the peace. Replying to just such a contention, it has been said:

"Actual personal violence is not an essential element in the offense. If it were, communities might be kept in a constant state of turmoil, fear, and anticipated danger from the wicked language and conduct of a guilty party, not only destructive of the peace of the citizens, but of public morals, without the commission of the offense. The good sense and morality of the law forbid such a construction." *Davis* v. *Burgess*, 54 Mich., 517, 20 N. W., 542 (52 Am. Rep., 828).

Counsel quote from 4 Am. & Eng. Enc. p. 902, "Actual or threatened violence is an essential element of a breach of the peace." But this must be read in connection with the statement on the next page, "at any rate, various acts having a tendency to produce a breach of the peace are themselves breaches of the peace." And in a note to the portion of the text quoted by counsel it is said: "Actual personal vio-

lence, is not an essential element in the offense of a breach of the peace;" and *Davis* v. *Burgess,* 54 Mich., 517, 20 N. W., 542, 52 Am. Rep., 828, is cited. Taken together, these quotations mean no more than that, while the author thinks violence an essential element of the offense, the necessary violence is present either when the act done is itself violent, or when, though not violent, it is of such a nature as to tend to result in or provoke violent acts, and thus threatens violence. This is manifest when we examine the two cases cited in support of the text quoted by counsel. Both cases expressly decide that the act itself need not be violent, but, if it is likely to result in violence, it is a disturbance of the peace. Thus in one of them (*State* v. *Warner,* 34 Conn., 276) the court said:

"It cannot be denied, and is not denied on the part of the accused, that his language was sufficiently scurrilous, abusive, and indecent, and calculated to stir up and provoke contention and strife, and so far to disturb the peace."

The other case is *Ware* v. *Branch,* 75 Mich., 496, 42 N. W., 1000, which was a prosecution for a breach of the peace, and it was said:

"It is not necessary that the peace be actually broken to lay the foundation to such a proceeding. If what is done is unjustifiable and unlawful, tending with sufficient directness to break the peace, no more is required."

Counsel also refer to 8 Ruling Case Law, p. 285, where it is said:

"Breaches of the peace generally manifest themselves by some outward, visible, audible, or violent demonstration, not from quiet, orderly, and peaceable acts secretly done, though such acts may be *mala prohibita*. Hence the carrying of arms in a quiet, peaceable, and orderly manner, concealed on or about the person, is not a breach of the peace. Neither does such an act, of itself, tend to a breach of the peace."

The language quoted is taken from *Roberson* v. *State,* 43 Fla., 156, 29 South., 535, 52 L. R. A., 751, and reference is made to *Judy* v. *Lashley,* 50 W. Va., 628, 41 S. E., 197, 57 L. R. A., 413. And these two cases do so hold. There is, of course, force in the argument that that cannot be a breach of the peace which is done secretly and is known to no one except the offender. As long as he merely conceals weapons about his person, no one can be actually disturbed by his act. This is true, not because the act itself lacks violence, but because it is secret, and because one's peace cannot be disturbed by that of which he has no knowledge. But the case is very different when an unlawful act is done openly, and is of such a nature as, in the natural course of events, it is calculated to lead to disturbances of peace and good order. So whether we would hold the carrying of concealed weapons a breach of the peace or not, these cases are clearly not in point. Moreover, the statement quoted immediately follows a statement of the law applicable to breaches of the peace in almost

the exact language we have quoted from *Davis* v. *Burgess.* Nor is our own case of *Hurd* v. *State,* 119 Tenn., 584, 108 S. W., 1064, in point. In that case there was no effort to justify the attempted arrest upon the ground that Hurd was carrying a pistol. The attempt was to arrest for an assault committed, but not in the presence of the officer.

But counsel say that in Massachusetts and Kentucky it has been directly decided that the unlawful sale of liquor is not a breach of the peace. *McLennon* v. *Richardson,* 15 Gray (Mass.), 74, 77 Am. Dec., 353, it is said, is authority for this contention. We do not think so. The question in that case was whether an officer had the right to break open the doors of a shop in which, it was alleged, the proprietor sold intoxicating liquors contrary to law, and was at the time engaged in selling and drinking intoxicating liquors and in gaming, and to arrest, without a warrant, those found present. The court held that he did not, but called the attention to the fact that it was not alleged that, at the time, there was any noise or disorderly drinking going on in the ship. It was thus made plain that the officer acted merely upon suspicion or information received from others. There was therefore no offense either committed or threatened in his presence. And an officer has no more right to arrest on suspicion or information, without a warrant, for a breach of the peace than for any other offense. Hence there was no occasion to discuss, and the court did not discuss the question as to what constitutes a breach of the peace.

Besides, it must be remembered that we have not held that an officer may break open doors and force an entrance into any place upon suspecting or being informed that a breach of the peace will then be committed or threatened in his presence.

The Kentucky case referred to is *Cornett* v. *Commonwealth*, 78 S. W., 858. But that case decides nothing except that the unlawful sale of liquor is not a breach of the peace to prevent which one could, under the law of Kentucky, be required to give bond to keep the peace. And this is exactly what we held under the Tennessee statutes. By the statute of Kentucky (Cr. Code Prac. sections 382, 391), such a bond can be required only to prevent an offense against the person or property of another, or a felony or an act of such violent character as to endanger human life. In holding invalid a bond which undertook to bind the defendant not to violate the liquor laws, the court said:

"Under these provisions, it has been held that a conviction of the defendant of an offense not amounting to a felony, and not involving a breach of the peace, is not a breach of the bond."

But this must be read in view of the case before the court. So read, it only means that the unlawful sale of liquor was not an offense against the person or property of another, or a felony, or an act of such violent character as to endanger human life, and hence did not belong to that class of breaches of the peace to prevent which the statute authorized a bond

to be taken.  We are the more ready to put this construction upon the language quoted because that court, in later cases, is clearly committed to the rule that violence is not an essential element of a breach of the peace.  The case of *Delk* v. *Commonwealth,* 166 Ky., 39, 178 S. W., 1129, L. R. A., 1916B, 1117, holds that indecent and obscene language used in the pulpit by a preacher is a breach of the peace, and, after a most comprehensive review of the authorities, concludes that actual violence is not an essential element of the offense, and that "not only all violations of the public peace or order, but acts tending to the disturbance thereof," are breaches of the peace.  To the same effect are 5 Cyc., p. 1024, Bishop's New Criminal Law, vol. 1, section 539, and Roberson's Criminal Law, vol. 2, section 581, and 8 Ruling Case Law, section 305.

This brings us to the case of *Robinson* v. *Miner,* 68 Mich., 549, 37 N. W., 21, the only case to which our attention has been called in which there is, in our opinion, a direct holding that the unlawful sale of liquor is not a breach of the peace.  And in that case the court was divided on the question.  The constitutionality of a statute of Michigan regulating the liquor traffic was involved (Laws 1887, No. 313).  All of the judges agreed that some of its provisions were invalid.  They disagreed, however, as to others.  One of the sections (section 17) about which they differed was that providing that all places, excepting drug stores, where liquors were sold, should be closed on

certain days and during certain hours on all other days; that the officers should close all places found open at such times; that persons violating these provisions should be deemed guilty of a breach of the peace and arrested without process. The majority opinion held the provisions allowing the officers to close the places and make arrests without process invalid, saying:

"Under our system we have repeatedly decided, in accordance with constitutional principles as construed everywhere, that no arrest can be made without warrant except in cases of felony, or in breaches of the peace committed in the presence of the arresting officer. This exception, in cases of breaches of the peace, has only been allowed by reason of the immediate danger to the safety of the community against crimes of violence, and it was confined, even in such cases, to instances where the violence was committed in the presence of the officer. There are not many such cases. The common and statute law provide for very few specified breaches of the peace, and there are none that are not specified. An indictment charging a person as a peace breaker, and not with any specified crime, would be good for nothing. Assaults and riotous conduct make up the largest part of the list. But there can be no breach of the peace within the meaning of the law that does not embrace some sort of violent as well as dangerous conduct. The manifest purpose of this statute is to bring certain

135 Tenn.—46

things that are not breaches of the peace within that denomination to avoid the necessity of a warrant. But, as already suggested, the Constitution cannot be so evaded. The cases covered by the statute present some peculiar features. No doubt keeping open places of sale late in the evening may lead to breaches of the peace, and, when they actually occur in an officer's presence, arrest may be made for that.''

In the face of the authorities we have cited, we cannot assent to the proposition that actual violence is necessary to constitute a breach of the peace. And this is the premise upon which the opinion is grounded, and without which both its reasoning and its conclusion are unsound. Nor can we agree that, if there is now a known list of breaches of the peace provided by ''the common and statute law,'' that list cannot be added to by further legislative acts. If there are now offenses, which by ''statute law'' are breaches of the peace, and for which arrests may be made without a warrant, we perceive no reason why future statute law may not put other offenses in the same category. Moreover, the opinion quoted wholly ignores what, as we have seen, practically all the authorities hold, that an unlawful act which tends to produce or bring about a breach of the peace or to disturb good order is itself a breach of the peace. Otherwise the statement that ''no doubt the keeping open places of sale late in the evening may lead to breaches of the peace,'' would have led to the conclusion that such unlawful keeping open was a breach

State v. Reichman.

of the peace even without the aid of a statute so declaring.

We are clearly of the opinion that much the better reasoning and the sounder conclusion are to be found in the opinion of Chief Justice Sherwood in the same case. He held the provisions in question valid, but at the same time, as we think, fully recognized every constitutional right that belongs to the citizen. In addition to the provisions mentioned, there were also provisions authorizing officers to close such places if certain requirements as to bond, taxes, and other things had not been complied with. Speaking of these, the Chief Justice said:

"Neither do I think it competent, under our Constitution, for the legislature to authorize a sheriff, marshal, constable, or police officer to close up a man's business at a time and place where and when he is allowed, under the law, to carry on such business upon complying with certain precedent conditions, when they have been performed, because such officer thinks he has good reason to believe that the dealer has been or is carrying on the business unlawfully, or has incurred a penalty or forfeiture in the manner he is carrying it on, as is permitted under section 7 of this act. A lawful business can only be interfered with, or a person's property taken from him or destroyed, after the owner has been served with proper process, and he has had his day in court, and been allowed the benefit and advantages of due process of law, and judgment of condemnation has passed against

him. It is then, and not till then, the ministerial officer can act, and such action must always be confined to the execution of the judgment and mandate of the court. The protection the law gives to the business and property of the citizen is not left to the discretion of a sheriff, a marshal, or a policeman, but to the law of the land, with courts, and officers under their direction to execute it. Of this protection to private property no owner can be lawfully deprived for a single moment.''

But after quoting section 17, which contained the provisions first referred to above, he said:

''This section prohibits the business being done at the times and in the places named, or the places being kept open, and a violation of the law in these respects is declared to be a breach of the peace, and the offense is punished accordingly. . . . The offense, too, is one that only needs to be seen to be detected. . . . . If . . . the officer is not permitted to close the doors of places of this sort, where and when it is forbidden to open them, or to carry on the business, and the offense is a breach of the peace, under such circumstances it is very clear that the community and society would be deprived of the most beneficial results intended by the legislation. To close the doors of saloons opened during the hours specified in this section is not, as is contended, destroying a man's lawful business, but to prevent him from committing a breach of the peace by doing an unlawful act, one forbidden and made criminal by law. I think the

State v. Reichman.

legislature may well authorize the officer to close the door of the saloon under such circumstances. I think this power is included in the power to prohibit, which has long since been adjudicated in this State to exist. I see nothing in this section unconstitutional or objectionable, nor anything more authorized than a reasonable exercise of the police power of the State will permit. . . . There is no doubt that, under the law as established by this court, it is entirely competent for an officer to make arrests without warrant of a person who is committing a breach of the peace in his presence, or is about to commit the same. Such was the rule at common law, and in my judgment it is good common sense. . . . It is the common knowledge of mankind that frequent quarrels, violence, and crime are induced by the excessive use of intoxicating liquor in places where it is kept and sold. And it is impossible to say that, when such places are kept open in the nighttime until after peaceful citizens have retired to rest, it is not a breach of the peace, in fact, and is no less such when made so by law; and when the offense is observed by those charged with the duty of maintaining the peace and enforcing the law, and who may serve process, I have no doubt of their power to make the arrest of the offender without process, and I cannot therefore hold the seventeenth section of the act objectionable in that regard.''

We think the clear distinction thus drawn between the protection which the law gives to one and his

property while engaged in a lawful business and the power which officers of the law may exercise toward him and his property to prevent him from using that property to breach the peace by committing an unlawful act is entirely sound. We would not detract, by one word, from the security which the Constitution guaranties to every man in his person and property. But when a man embarks himself and his property in the conduct of a business which it is unlawful to conduct, both become subject to such force as may be necessary to prevent his carrying out his unlawful purpose. The Constitution gives him no right to violate and defy the law, and when he has been prevented from doing that which is unlawful he has been denied no constitutional right. The business of selling intoxicating liquors as a beverage has been outlawed in Tennessee. He who engages in it makes himself subject to the penalties of the law just as any other lawbreaker. He cannot use his property in such business and expect it to be protected by the law with the same sacredness that property held and used for lawful purposes is protected. The majority opinion in the case referred to is the only case we have seen which we regard as deciding that the unlawful sale of liquor is not a breach of the peace. But believing that it is based on the fundamental error that actual violence is necessary to such an offense, and that it is therefore out of line with the overwhelming weight of authority, we find ourselves unable to follow it or adopt its conclusions. More-

over, we do not think this majority opinion can be reconciled with the later ruling of the same court in *Ware* v. *Branch,* which we have already quoted. And in the still later case of *Scougale* v. *Sweet,* 124 Mich., 311, 82 N. W., 1061, the question was whether the playing of baseball on Sunday, which, by a statute similar to our Sunday statute, was made unlawful under a small penalty, but was not expressly declared to be a breach of the peace, could be held to be a breach of the peace. After a careful examination of the authorities, the court accepted the definition adopted by this court in *Galvin* v. *State,* supra, and said:

"Where the statute prohibited the arrest of any person on Sunday, except in cases of treason, felony, and breaches of the peace, a ball game upon Sunday was held to be a breach of the peace. *In re (Carroll),* 12 Wkly. Law Bul. (Ohio), 9. Under our statute, and under the authorities referred to, this game of baseball was a breach of the peace."

Surely it cannot be said that a saloon, at a place where the law prohibits the sale of intoxicating liquors, is less unjustifiable or less unlawful than a game of ball on Sunday, and undeniably it tends with no less directness to break the peace. It is true that in *Yerkes* v. *Smith,* 157 Mich., 557, 122 N. W., 223, the majority opinion in *Robinson* v. *Miner* was quoted with approval. But *Scougale* v. *Sweet* was also approved. The holding was that a game of baseball on Sunday is not necessarily a breach of the peace, though it may be and is when played in a public

place and attended by a crowd assembled unlawfully and tumultuously so as to create disorder. This conclusion was reached because the statute did not make the playing of such a game an indictable misdemeanor, but only made it unlawful and subjected the offender to a penalty. For this reason it was said that, to authorize an officer to make an arrest, there must be some overt act of violence or disorder. This is far from a holding that an act which the legislature, for the purpose of preserving peace and good order, declares to be a misdemeanor, is not a breach of the peace.

True our prohibitory statutes do not, in terms, declare the unlawful sales of liquor to be breaches of the peace. But, ever since it was first found necessary to regulate the liquor business, this court has consistently held the statutes and ordinances providing such regulations to be peace measures; that is, measures adopted for the purpose of preserving peace and good order. At the same time it was declared, at least 50 years ago, in accord with practically all the authorities, that any unlawful act which disturbs or tends to disturb peace and good order is a breach of the peace. Certainly no strained or unreasonable construction is required to say that the violation of the law which the legislature found it necessary to enact in order to preserve peace and good order disturbs or tends to disturb peace and good order. And when, after this court had held these regulations to be for the preservation of peace and order, the legislature

deemed it necessary to entirely prohibit, by law, the business which it had previously permitted only under a bond to keep the peace, it cannot be doubted that the purpose of the latter law was the same, and that offenses under it must be placed in the same category.

*In re Kellam*, 55 Kan., 700, 41 Pac., 960, is pressed upon our attention. But that case is not in conflict with anything we have decided. It merely holds invalid an act which undertook to authorize officers to make an arrest, without a warrant, not only upon seeing an offense committed, but also "upon reasonable suspicion that an offense has been committed." We have not, however, held that an arrest, without a warrant, can ever be rightfully made on suspicion or on information received from others. On the contrary, we have held exactly the opposite, saying distinctly that, to authorize an arrest for a misdemeanor not committed in the presence of an officer, a warrant is always necessary. In fact, we have not held that it was the duty of the defendant to do anything on suspicion or information except to go to the places which he suspected or had reason to believe were being run as saloons, and to observe what any customer could observe, and then to take only such action as would be justified by what he saw.

Counsel argue that it cannot be said that the unlawful sale of liquor is a breach of the peace because, they say, a proper construction of the statutes excludes such a conclusion. The insistence is that be-

cause the legislature has limited the right of the sher-
iff to arrest and require security to keep the peace to
cases in which the accused is armed for the purpose
of committing certain offenses, and has provided for
such security in no other cases except upon the com-
plaint, before a magistrate, of one whose person or
property is threatened, an intention has been ex-
pressed that nothing else shall be considered breaches
of the peace.   We do not agree to this.   Rather do
we think the legislature, recognizing the great number
and variety of acts which may constitute that of-
fense, did not deem it necessary to the public peace
that, in all cases, security should be required.   Those
offenses which were deemed to be most seriously men-
acing in their nature were selected, and as to them
the sheriff was required to take steps to place the
offenders under bond.   In addition, a method was
provided by which one whose person or property was
threatened could himself take steps to that end.   All
other breaches of the peace were deemed sufficiently
guarded against by requiring the sheriff to prevent
and suppress them, and authorizing him to make
arrests, without warrants, when they are threatened
in his presence.   Moreover, when the business of sell-
ing liquor was lawful, it was, as we have seen, only
lawful after a bond had been given to keep the peace.
Hence, even if counsel were right in the contention
that in Tennessee the only breaches of the peace are
those things as to which the legislature has protected
the public by providing means of requiring a bond

State v. Reichman.

to keep the peace, the conducting of a saloon would come clearly within the rule. It is, in fact, conspicuously within the rule; for it furnishes, we believe, the only example of requiring a peace bond without some sort of judicial proceeding.

Counsel complain that our opinion leaves them in doubt as to what the sheriff should do after arresting a man for a threatened sale of liquor. But if it is borne in mind that such arrests are preventive rather than punitive measures, we think there can be no difficulty on that score. Circumstances can be fancied or imagined under which the performance of any of the duties devolving on the sheriff may become embarrassing and irksome. But practically there is no serious trouble. We have held that the duty of the officer to make these preventive arrests arises only when he finds one under such circumstances as amount to a threat to sell liquor unlawfully. We have not and cannot undertake to set out all the circumstances which will amount to such a threat. We have, however, used a saloon equipped, open, and ready for business as an example, and held that it was the duty of the officer to arrest the person in charge for the purpose of preventing the threatened sales of liquor. We do not mean to say that there are not other circumstances which would justify such arrests. We selected open saloons for an illustration because the record showed that they existed and ought to have been dealt with by the defendant. We have not held that such arrests should be followed by confining the

offender in jail.   We said in the course of argument
that the Alabama court had held that there might
be circumstances under which a person arrested to
prevent a breach of the peace might be rightfully con-
fined in jail.   But this was said merely to illustrate
the point that such, and only such, force is justified
as is reasonably necessary to prevent the threatened
offense.   We can well imagine circumstances under
which, in times of great excitement, such imprison-
ment might be the only practicable means of prevent-
ing great disorder and turbulence.   But we think it
can rarely, if ever, be necessary to prevent threatened
sales of liquor, and we do not now hold that it can
ever be justified in such cases.   The duty of the
sheriff, when he has seen no sales made, but makes
an arrest to prevent sales threatened in his presence,
is to prevent the sales which the offender is then
ready and equipped and threatening to make.   When
this is accomplished, his duty for that occasion is
ended.   He may do this by removing the liquors from
the place.   The proprietor will then not be equipped
to sell and the sales threatened in the presence of
the officer will have been prevented, and there will be
no further occasion to detain the person arrested.   Or
he may close the place, and thus prevent the sales,
and then let the person arrested go free.   We said in
our former opinion that he will have the right to close
the place and keep it closed until the purpose to con-
duct it as a saloon is abandoned.   This perhaps does
not quite accurately express what we meant to say.

He should keep it closed until the danger of the sales then threatened has passed. This will be accomplished when the liquors have been removed and the necessity of keeping the place closed will no longer exist and that particular incident will be ended. In other words, he must do what is necessary to prevent the sales then threatened, and leave future sales and future threats to be dealt with as they arise. In practice, a few such arrests will effectually put an end to open saloons, and the same good judgment which is necessary to the discharge of his other duties will enable him to perform these duties without serious difficulty.

These are the things which it is the duty of a sheriff to do to prevent violations of law. They involve the exercise of the undoubted power of the government to prevent unlawful acts as well as to punish for offenses committed. Speaking of this power and the wisdom of its use, the Supreme Court of the United States has said:

"Certainly it seems to us to be quite as wise to use the processes of the law and the powers of the court to prevent the evil as to punish the offense as a crime after it has been committed." *Eilenbecker* v. *District Court,* 134 U. S., 31, 10 Sup. Ct., 424, 33 L. Ed., 801.

But it seems to be argued by counsel that it is a serious invasion of the rights of citizens to permit the sheriff, without process, to seize liquors or close places of business for the purpose of preventing breaches of the peace. But if, for that purpose, a

man may be arrested, and thus deprived of his liberty, he certainly cannot complain because he is deprived of a mere property right which he is using as a means of breaching the peace. That, for the purpose of preventing a public offense, an officer may seize and detain the things about to be used in the commission of the offense, is no new doctrine. The rule is well stated in a headnote to *Spalding* v. *Preston,* 21 Vt., 9, 50 Am. Dec., 68, which fairly interprets the decision in that case as follows:

"The officers of government have authority, derived from the general rights of the government, without any statute whatever upon the subject, to exercise all necessary force for the prevention of crime, either by the arrest of individuals, or by the seizure and detention of the instruments for committing crime."

More or less to the same effect are *Shanley* v. *Wells,* 71 Ill., 78; *O'Connor* v. *Bucklin,* 59 N. H., 589; *Ross* v. *Leggett,* 61 Mich., 445, 28 N. W., 695, 1 Am. St. Rep., 608; *Ex parte Morrill* (C. C.), 35 Fed. 261.

In a supplemental brief, counsel for defendant have quoted from *Quinn* v. *Heisel,* 40 Mich., 578, as follows:

"We are of opinion that a threat or other indication of a breach of the peace will not justify an officer in making an arrest, unless the facts were such as would warrant the officer in believing an arrest necessary to prevent an immediate execution thereof, as where a threat is made coupled with some overt act

in attempted execution thereof. In such cases the officer need not wait until the offense is actually committed. To justify such arrest the party must have gone so far in the commission of an offense that proceedings might thereafter be instituted against him therefor, and this without reference to any past similar offense of which the person may have been guilty before the arrival of the officer. The object of permitting an arrest under such circumstances is to prevent a breach of the peace, where the facts show danger of its being immediately committed.''

The only thing in this quotation which is not fully in accord with what we have held is the statement that, ''to justify such an arrest, the party must have gone so far in the commission of an offense that proceedings might thereafter be instituted against him therefor.'' We have not had access to the statutes of Michigan, but the numerous Michigan cases to which our attention has been called make it plain that there is, in that State, no statute like ours, expressly authorizing an arrest for a threatened breach of the peace. Viewed in the light of this fact, the language quoted strongly supports our conclusion in this case. Regarding the right of an officer, by the common law, to make an arrest, without a warrant, as confined to breaches of the peace actually committed in his presence, the court nevertheless recognized his preventive duty to the extent of holding that his duty to interfere begins whenever any act is done which amounts to an attempt to commit the offense. But treating this as a

correct statement of the common-law rule, our legislature evidently intended to enlarge the preventive duties of the officer when it authorized him to arrest for a threatened breach of the peace. Under the common law, the Michigan court held that an attempt would justify an arrest. Under our statute, a threat is put in the same category.

It is insisted that the sheriff is not the only peace officer, that the judges and others are also conservators of the peace, and that, if the sheriff is onerated with the duties we have held belong to his office, the same duties rest upon these other conservators of the peace. Of course, we are not now called on to define the duties of any officer except a sheriff. But we may remark that, while there are many officers who, by virtue of their offices, are also conservators of the peace, our statutes, in line with the nature of the office from the most ancient times, make the sheriff the chief conservator of the peace in his county. His official character has been shown by the authorities already quoted. We have held that he is charged with the duties described not merely because he is called by the statute a conservator of the peace, but because they have always belonged to his office, and because, in express terms, our statutes make it his duty to suppress and prevent public offenses and breaches of the peace. It is sufficient now to say that not all conservators of the peace ·are charged with all the duties of the sheriff. The making of an arrest is only one of the things to be done for the pur-

pose of preserving the peace.  Every officer charged
with the duty of doing any of these things is, to that
extent, a conservator of the peace.  But, in order to
determine what are his duties, we must look not only
to the fact that he is a conservator of the peace, but
to the particular duties which the law attaches to his
office.

It is insisted that the case of *McCrowell* v. *Bristol,*
5 Lea, 685, is authority against the right of an officer
to close a saloon.  But that case was decided when the
saloon business was lawful in Tennessee, and all that
was held was that municipal authorities could not,
without judicial proceedings, declare a saloon a nui-
sance on account of the manner in which it was con-
ducted, and abate it.  But now the saloon business is
unlawful.  And it has never been the law in Tennessee
that officers could not stop any public offense commit-
ted or about to be committed in their presence.

It is finally insisted that no willful neglect of duty
has been shown.  On this question defendant is pre-
cluded by his admission that he did nothing in Mem-
phis except to serve process.  He may not have un-
derstood some of his duties as we have defined them.
We have not, however, removed him merely because
he failed to make arrests for threatened violations of
the law.  In view of the advice given him by counsel,
and of the fact that there had been no previous deci-
sion of the question, if he had made an honest effort
to suppress and prevent violations of the law by
doing the other things we have held it was his duty

135 Tenn.—47

to do, we would probably hold that his failure in this respect was not a willful neglect of duty, and that he should not be removed. But the record shows and he admits that he did nothing but serve such process as was placed in his hands. And any man of intelligence, who, as sheriff, under the conditions disclosed by this record, did nothing but serve process, must be deemed to have willfully failed and neglected to perform the duties of his office.

There is nothing in what we have decided to justify the excited statement of counsel that there is involved a ''controversy between the people and their liberties, and a doctrine which would seriously oppress the one and impair the other.'' We have only applied to the class of offenses under consideration the same rule that has from time immemorial been applied to other offenses of no more gravity and fraught with no more danger to the public. We have merely said that it is the duty of the faithful officer to interfere to prevent offenses of this kind, just as he has always interfered when similar offenses were threatened in his presence. The rules we have laid down authorize the interference with a citizen only when he is about to do that which the law denounces. And we refuse to recognize as one of the liberties guaranteed by any government to its citizens the privilege of violating its laws. Nor is there any element of oppression of the people in making effective the mandate of their own laws that, for the good of the public, they shall not do certain things.

State v. Reichman.

After examining the questions involved with the care merited by their importance and the earnestness and ability of counsel, we are satisfied with the conclusions heretofore. announced, and the petition to rehear will be dismissed.